# STATE

### v.

## William B. BURKE and Richard R. St. Pierre.

### No. 89–55–C.A.

Supreme Court of Rhode Island.

May 18, 1990.

1218

James E. O'Neil, Atty. Gen., Jeffrey Greer, Annie Goldberg, Asst. Attys. Gen., for plaintiff.

Richard Casparian, Public Defender, Catherine Gibran, Barbara Hurst, Asst. Public Defenders, Susan B. Iannitelli, North Providence, for defendant.

## OPINION

FAY, Chief Justice.

On April 13, 1988, a jury convicted William B. Burke (Burke) and Richard R. St. Pierre (St. Pierre) of conspiracy to rob and two counts of robbery. Burke, individually, was also convicted of one count of attempted robbery, and St. Pierre, individually, was convicted of assault and battery on a person over sixty years of age. The defendants appeal these convictions, rest-

ing upon several assignments of error. We affirm in part and reverse in part.

A brief discussion of the facts follows, with additional facts elicited as they are relevant to the various legal issues raised in this opinion. On the evening of June 15, 1985, between 10:30 p.m. and 10:45 p.m., a robbery occurred at Chick's Spa, a small variety store located in Manville, a village in the town of Lincoln. During the course of the robbery the owner of the store, Lucien Laurence (Laurence), also known as Chick, was beaten. Only one customer, Brian Dupont (Dupont), was in the store at the time of the incident, and he too was beaten by one of the perpetrators. When Dupont left the store in an effort to secure assistance, he was met outside by a second man, who was wielding a knife. The man instructed Dupont to lie on the ground. Dupont complied, and his back pockets were searched.

While Dupont remained lying on the ground, an automobile driven by Matt Salisbury (Salisbury) and carrying Paul Brassard (Brassard) pulled up outside the store. Brassard got out of the car, approached the entrance, and was met by the man holding a knife. Although he noticed the man on the ground, he continued into the store, thinking the incident merely a prank. Upon entering the store, he realized a robbery was in progress. Brassard witnessed Laurence's being struck with a baseball bat held by the perpetrator inside the store. Brassard, turning around, was himself then struck with the bat and fell.

Outside, Salisbury witnessed Brassard's being struck and then noticed that another man was standing outside the store. Salisbury started to drive away, changed his mind, turned the car around, and saw someone leaving the store. He then gave chase to the fleeing person in and around the Manville area. Salisbury followed for several blocks until the person disappeared between a row of buildings. Salisbury then headed for the apartment of Brassard's girlfriend, Shelly, to tell her to call for help. After driving around the area once again, he returned finally to pick up Shelly. Salisbury's car was responsible for

a bit of noise in the Manville area that evening as his tires squealed and brakes screeched.

The Lincoln police first arrived at the scene at approximately 10:50 p.m. and commenced the investigation of the incident. Laurence was taken by a rescue unit to the hospital for treatment of his injuries. He checked himself out later that same evening. Laurence died two months later at the age of seventy-one.

In its case against Burke and St. Pierre, the state presented seventeen witnesses to testify about the events that occurred on the evening of June 15, 1985. Five of these witnesses were present, at some point, at a gathering at the home of Yvonne and Thomas Drawdy located several blocks from Chick's Spa. The testimony of these witnesses was utilized to link Burke and St. Pierre to the descriptions provided by Dupont, Brassard, and Salisbury. The remaining evidence was presented in the form of testimony from various law enforcement officers, neighbors, a clerk at a local liquor store who stated that Burke had charged beer earlier that evening, and Gloria Flaherty (Flaherty), Laurence's daughter. Subsequent to the presentation of this evidence, the jury found both defendants guilty of two counts of robbery and conspiracy to rob. Burke was also found guilty of attempted robbery, and St. Pierre was found guilty of assault and battery of a person over sixty years of age. The trial justice sentenced Burke to five years' imprisonment for the attempted robbery of Dupont, ten years' imprisonment for conspiracy to rob Laurence, and life imprisonment for the robbery of Laurence, all to run consecutively. He received a suspended life sentence for the robbery of Brassard, which is also to run consecutively to the other sentences. The trial justice sentenced St. Pierre to ten years' imprisonment for conspiracy to rob Laurence and life imprisonment for the robbery of Laurence, these sentences to run concurrently. He received a sentence of five years' imprisonment for the assault of Laurence, to run consecutively to the other sentences. Finally for the robbery of Brassard the trial justice imposed a suspended life sentence.

The admission of Flaherty's testimony under Rule 804(c) of the Rhode Island Rules of Evidence is one of the subjects of this appeal. Other issues include whether the state violated Rule 16 of the Superior Court Rules of Criminal Procedure with respect to the testimony of Flaherty and Donna Cournoyer Cole (Cole), an allegedly mentally deficient witness whose disabilities were not made known to defense counsel. Burke, individually, asserts that the state was improperly permitted to impeach its own witness. St. Pierre, individually, assigns error to the admission into evidence of statements made by Burke against St. Pierre because such statements were not made in furtherance of a conspiracy and contends that the trial justice improperly denied him his right to make an opening statement under Rule 26.2 of the Superior Court Rules of Criminal Procedure. For the sake of clarity we shall first address the common issues on appeal and then consider defendants' individual contentions.

I

TESTIMONY OF GLORIA FLAHERTY

A. Rule 804(c)

■ The objection to the admissibility of certain testimony given by Laurence's daughter presents us with the novel and important question of the validity of recently enacted Rule 804(c) of the Rhode Island Rules of Evidence as it applies in the criminal context. Rule 804(c) provides for the admissibility into evidence of hearsay statements made by a deceased person. The rule reads:

"*Declaration of Decedent Made in Good Faith.* A declaration of a deceased person shall not be inadmissible in evidence as hearsay if the court finds that it was made in good faith before the commencement of the action and upon the personal knowledge of the declarant."

Flaherty testified to out-of-court statements Laurence made to her after his discharge from the hospital on the evening of

the robbery. Defense counsel objected, specifically, to the following testimony:

"Q Do you recall exactly what he said concerning any monies missing from the robbery?

MR. SHOER: Objection.

MR. McKINNON: Objection.

THE COURT: You may answer yes or no; whether you recall or not.

"A Yes, he did comment.

"Q What did he say about monies missing?

MR. McKINNON: Objection.

THE COURT: Objection overruled. You may answer.

"A He said that they took—they didn't get the big money they got between—they took between 30 or 40 dollars.

"Q Did your father tell you what the robbers said while he was being robbed?

"A He was very clear on that. He said that they wanted the big money, whatever that was. They kept saying the big money; the big money, and that's—that's all he kept saying.

"Q And what was the total amount of money that your father told you was missing?

"A Between 30 and 40." [1]

The objection to this testimony was premised upon the assertions of counsel that Rule 804(c) does not operate to render such hearsay statements admissible in criminal proceedings. The defendants rely upon two theories to support such an assertion. First, the language of the rule on its face demonstrates that it was intended to apply only to civil actions. Second, the applicability of Rule 804(c) in a criminal proceeding would unduly infringe upon a defendant's constitutional right to confrontation. U.S. Const.Amend. VI; U.S. Const.Amend. XIV; R.I. Const. art. 1, § 10.

Rule 804(c), which became effective October 1, 1987, was enacted to replace General Laws 1956 (1985 Reenactment) § 9–19–11, repealed by P.L.1987, ch. 381, § 5. The rule, which was taken unchanged from § 9–19–11, is reminiscent of a similar statute existing in our sister state of Massachusetts. *See* Mass. Gen. Laws Ann. ch. 233, § 65 (West 1986). The Supreme Judicial Court of Massachusetts has construed the language of its own statute to preclude application in criminal proceedings. *See Commonwealth v. Gallo*, 275 Mass. 320, 175 N.E. 718 (1931). It is this very construction that defendants rely upon in urging us to limit application of our own Rule 804(c).

In *Commonwealth v. Gallo*, the supreme judicial court held that Massachusetts General Laws, chapter 233, section 65, was not intended to permit otherwise hearsay statements to be entered into evidence in a criminal prosecution. The language of § 65, as it existed at the time, was identical to Rule 804(c). The supreme judicial court in reaching its determination, however, looked to the language of the statute as first enacted. *Gallo*, 275 Mass. at 335, 175 N.E. at 725. The Massachusetts court found that "[t]he provision was first enacted in substantially the same language in St. 1898, c. 535, except that the word 'suit' was used in place of the word 'action.' By no possible stretch of meaning can 'suit' be held to include prosecutions for crime." *Id.* Thus, the original language of § 65 lent credence to the court's conclusion that " '[a]ction', although a word of broad import, can hardly be interpreted in this connection as intended to include prosecutions for crime." *Id.*[2]

■ We are not persuaded by the holding in *Gallo*, nor must we struggle with the language of our own Rule 804(c) in an effort to discern the legislative intent be-

1. The trial justice conducted a voir dire hearing on admissibility prior to the presentation of this testimony before the jury.

2. The Massachusetts statute, Mass. Gen. Laws Ann. ch. 233, § 65 (West 1986), in its present form, reads:

"Admissibility of declaration of decedent

In any action or *other civil judicial proceeding,* a declaration of a deceased person shall not be inadmissible in evidence as hearsay or as private conversation between husband and wife, as the case may be, if the court finds that it was made in good faith and upon the personal knowledge of the declarant. Amended by St. 1941, c. 363, § 1; St.1943, c. 232, §˙1."
(Emphasis added.)

hind its enactment. The Advisory Committee's notes clearly articulate the intended reach of the exception.

"Unlike the exception for dying declarations contained in proposed [Federal] rule 804(b)(2), this exception applies in *all criminal* and civil cases, and is not limited to the cause or circumstances of the declarant's impending death.

"Application of this exception to criminal cases goes beyond the scope of Massachusetts statute from which this rule derives, but there appears no persuasive reason to limit the exception to civil cases. Constitutional considerations concerning the admission of statements under this section against an accused are subject to the same analysis as statements admitted under the exceptions for dying declarations, former testimony, etc." (Emphasis added.)

Accordingly the statute was intended to apply to criminal proceedings, provided, of course, that constitutional safeguards are met. Hence we address defendants' constitutional concerns.

The importance of a defendant's constitutional right to confront and cross-examine witnesses cannot be understated. In holding these Sixth Amendment rights applicable to the states by the Fourteenth Amendment, the United States Supreme Court in *Pointer v. Texas*, 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923, 927 (1965), concluded that "[t]here are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." Additionally our own State Constitution, recognizing the import of such rights, affords a defendant the opportunity to confront and cross-examine witnesses. R.I. Const., art.

1, § 10; *see also State v. LaChappelle*, 424 A.2d 1039, 1043 n.4 (R.I.1981).

The strict requirement of confrontation in the Sixth Amendment, however, is tempered by the dictates of practicality and judicial economy. *See Ohio v. Roberts*, 448 U.S. 56, 63–64, 100 S.Ct. 2531, 2537–38, 65 L.Ed.2d 597, 605–06 (1980). Therefore, exceptions to the controversial hearsay rule requiring exclusion of out-of-court statements have evolved to encompass a great deal of testimony rendering admissible that which would otherwise never reach the factfinder. *See, e.g.*, Fed.R.Evid. 803, 804; R.I. R. Evid. 803, 804 (hearsay exceptions). The United States Supreme Court in *Ohio v. Roberts*, acknowledging the necessity of a peaceful coexistence between a defendant's Sixth Amendment guarantees and the jurisdictional interest in "effective law enforcement," articulated a general approach to admissibility questions of hearsay evidence. 448 U.S. at 66, 100 S.Ct. at 2359, 65 L.Ed.2d at 608. Justice Blackmun, writing for the majority, stated that "when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id.* Thus *Roberts* established a two-tiered test of admissibility that the high court, as well as lower Federal and State Courts, cites with approval in analyzing out-of-court statements. *E.g., Bourjaily v. United States*, 483 U.S. 171, 182–83, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144, 157 (1987);[3] *Puleio v. Vose*, 830 F.2d 1197, 1204–05 (1st Cir.1987) (and cases cited); *Manocchio v. Moran*, 708 F.Supp. 473, 475 (D.R.I.1989); *State v.*

**3.** *Bourjaily v. United States*, 483 U.S. 171, 182–83, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144, 157 (1987), rejected the need to look for "independent indicia of reliability" with respect to statements admitted under Rule 801(d)(2)(E) of the Federal Rules of Evidence. The Court, empha-

sizing the existence of the two-tiered analysis of *Roberts*, held such statements admissible as a "firmly rooted hearsay exception," thereby obviating the need for further inquiry into the reliability of the out-of-court declarations.

*Maldonado*, 13 Conn.App. 368, 375, 536 A.2d 600, 604 (1988); *Commonwealth v. Trigones*, 397 Mass. 633, 637–38, 492 N.E.2d 1146, 1149 (1986); *State v. Anthony*, 448 A.2d 744, 753–54 (R.I.1982).

Against this constitutional backdrop we turn now to consider the propriety of admitting into evidence, under Rule 804(c), the out-of-court statements made by Laurence to his daughter. The statements do not fall within a "firmly rooted hearsay exception" such as prior recorded testimony as discussed in *Mancusi v. Stubbs*, 408 U.S. 204, 213–16, 92 S.Ct. 2308, 2313–15, 33 L.Ed.2d 293, 301–03 (1972). Nor was the statement a dying declaration made in anticipation of impending death as recognized in *Mattox v. United States*, 156 U.S. 237, 242–43, 15 S.Ct. 337, 339–40, 39 L.Ed. 409, 410–11 (1895), or any of the other exceptions embodied in the Federal Rules of Evidence. We must therefore determine whether these controversial declarations bear any "indicia of reliability" as required by *Roberts*.[4]

In the circumstances of the case before us we find that the testimonial evidence at issue carries the requisite reliability and trustworthiness to pass constitutional muster. The indicia of reliability is apparent in the trial justice's findings with respect to the requirements of our own Rule 804(c), that the statements were made in "good faith before the commencement of the action and upon the personal knowledge of the declarant." The trial justice specifically found that the good-faith requirement is satisfied

"because they are the words of an individual who purportedly had just been robbed and beaten with a baseball bat; an individual who was taken to the hospital and returned and is speaking to a blood relative, his daughter; and he's saying to his daughter precisely what she says she is going to testify to.

"In the Court's judgment that's a statement made in good faith. It's not made to a police officer. It is made to a family member, and it has to do with something that occurred and was stated prior to the commencement of this action. This statement was made even before the defendants were arrested. It is made on the premises shortly after this robbery occurred."

We think that these findings also amply fulfill the indicia-of-reliability requirement set forth in *Roberts* and that, therefore, the admission of the testimony was constitutionally sound.[5]

**B. Rule 16 Violation**

The defendants assign error to the admission of Flaherty's testimony as a violation of Rule 16 of the Superior Court Rules of Criminal Procedure. Rule 16 allows for broad discovery in order to prevent hardship or surprise during the conduct of criminal trials. *See State v. Ricci*, 472 A.2d 291, 299 (R.I.1984); *State v. Concannon*, 457 A.2d 1350, 1352–53 (R.I.1983). The remedy for a violation of this rule varies depending upon whether the nondisclosure of certain facts was deliberate or inadvertent. *Concannon*, 457 A.2d at 1353–54. A deliberate nondisclosure by a party to a criminal proceeding results in the granting of a new trial. *Id.* at 1353. If the nondisclosure was inadvertent, the existence of procedural prejudice determines whether such a remedy is appropriate. *Id.* at 1354.

In the case before us defendants take specific exception to Gloria Flaherty's testimony that "they [the robbers] took between 30 or 40 dollars." The defendants contend that this testimony was substantially different from that represented by the state through discovery. The state informed defendants on Monday, March 28, 1988, that Flaherty would testify "about monies missing from the store in which her

4. The unavailability requirement of *Roberts* has since been relaxed, at least with respect to statements made by coconspirators. *See United States v. Inadi*, 475 U.S. 387, 394, 106 S.Ct. 1121, 1125, 89 L.Ed.2d 390, 398 (1986). Unavailability in this case is clearly undisputed.

5. The defendants' additional contention that the admission of Flaherty's hearsay testimony was error because it was the only proof of a wrongful taking lacks merit. The record indicates that Brassard's testimony also supports the jury finding that money was taken.

father worked." This representation, as compared with the testimony ultimately elicited, defendants assert, operates as a Rule 16 violation because the disclosure was not specific.

Without determining whether this contention holds any merit, we find that defendants are in no position to raise such an issue, having waived any Rule 16 objection to this testimony in the trial court. The following dialogue took place in front of the trial justice and on the record:

"MR. SULLIVAN [for the state]: * * * I should also point out to your Honor that yesterday I mentioned to defense counsel and this morning firmed up a supplement to the discovery, in that a witness by the name of Gloria Flaherty will be called to the stand to testify about monies missing from the store in which her father worked, because that witness is now deceased.

"MR. McKINNON [for defendant Burke]: We advised, we'll waive any Rule 16 objection to that.

"THE COURT: All right.

"MR. SHOER [for defendant St. Pierre]: I also have no objection to that, your Honor."

This extract clearly reflects a waiver on the part of defense counsel to the testimony of Flaherty. The state made a general representation about the testimony it intended to elicit from this particular witness. Rather than ask for more specific details about the witness's testimony, defendants' counsel waived any objection they may have otherwise been entitled to make. The trial justice also recognized this factor in holding a waiver of the objection occurred. The trial justice found "[defense counsel] accepted the prosecution's statement with regard that money was taken. [Defense counsel] did not ask the context in which that testimony was going to be given." The trial justice went on to note: "[Defense counsel] accepted the generalization as to what Mrs. Flaherty might testify to, no matter what it might have been. And consequently, I find that there's no Rule 16 rule [sic] violation here." We agree with these findings.

## II

### TESTIMONY OF DONNA COURNOYER COLE

 The defendants also take issue with the trial justice's refusal to allow an independent inquiry into the mental capabilities of witness Donna Cole. They assert that failure to obtain additional impeaching information effectuates a violation of due process rights afforded all criminal defendants. Additionally the prosecution, defendants contend, was under an obligation to disclose information it considered material exculpatory evidence.

On the evening of June 15, Cole was present at the Drawdy house, several blocks from Chick's Spa. The defendants were also present at the Drawdy house that evening. Cole testified that on the evening of the robbery defendants Burke and St. Pierre "came running into the house" and "knocked [her] out of the way." She noted that defendant Burke was breathing hard and later got sick. Concerning defendant St. Pierre, Cole testified that he ran down into the cellar and came back up with money sticking out of his pants pockets.

As Cole's testimony progressed, it became apparent that she was laboring under some type of mental deficiency. When the trial justice became aware of the irregularity, he called counsel to the bench and the following discussion occurred:

"THE COURT: Mr. Sullivan, have you interviewed this witness?

"MR. SULLIVAN: Yes I have. She did fine on the second floor. She has a learning disability.

"THE COURT: Pardon?

"MR. SULLIVAN: She has a learning disability.

"THE COURT: So she does?

"MR. SULLIVAN: Yes.

"THE COURT: Because some of the answers are very lucid.

"MR. SULLIVAN: I understand.

"THE COURT: And some of the time it looks as though she's not even here. Is she impaired in some way?

"MR. SULLIVAN: She has some sort of brain damage.

"THE COURT: That accounts for it.

"MR. SHOER: That certainly does. I agree with your Honor, if that's the case.

"MR. McKINNON: Armed with that information—I thought she was an illiterate—now with that information, I ask the Court to inquire as to her credibility as a witness, what type of brain damage, to what extent is the brain damage. What does it impair?

"THE COURT: No, you've been apprised of that fact. Now you can use *State vs. Manocchio* in your cross-examination.

"MR. SULLIVAN: I'm sorry, maybe I misspoke or gave the wrong impression. To my knowledge, the brain damage or the impairment affects her ability to read, which she reads at a kindergarten level. But not her cognitive function. That's what I've been informed.

"MR. SHOER: I'm sorry. Well I'm just, I'm confused, only to the extent, if this witness is in fact suffering under some mental incapacity that would affect her ability to testify fairly, accurately or truthfully, I'm wondering if that's the kind of information that should have been disclosed prior to trial.

"THE COURT: I might say generally that if she keeps on in this fashion, the defendants needn't have any concern."

After this discussion Cole was permitted to continue with her testimony. Subsequent to direct examination but prior to crossexamination, defense counsel for defendant Burke attempted to join in what he perceived as counsel for St. Pierre's "objection" to Cole's testimony on the ground that her mental incapacity should have been disclosed. This objection was offered after court recessed for the weekend. Counsel for Burke also objected, at this time, to the admission of Cole's testimony on the ground that her testimony was exculpatory.

Although defense counsel argued vigorously before this court that the state's failure to disclose information relative to Cole's mental deficiencies constituted a Rule 16 violation, a careful reading of the record reflects a notable absence of a specific Rule 16 objection. It is axiomatic in our appellate procedure that in order for this court to address a specific question of law, that issue must be properly preserved in the trial court. Super. R. Crim. P. 51; *see State v. Roderick*, 121 R.I. 896, 898, 403 A.2d 1090, 1091 (1979). In the case at bar we decline to address specifically defendants' Rule 16 objections because defendants also objected to the admission of Cole's testimony on the grounds that a deliberate nondisclosure of exculpatory evidence occurred. In *State v. Wyche*, 518 A.2d 907, 911 (R.I.1986), we held that the same standards that govern Rule 16 violations also govern questions of nondisclosure, and therefore, defendants' untimely Rule 16 objection, offered by counsel for defendant Burke, will indirectly receive our consideration.

The specific issue with regard to the admission of Cole's testimony is not a novel one. The defendants maintain that the prosecution's failure to provide them with information about Cole's mental disability prior to trial effectuated a violation of due process. They contend that the state deliberately refrained from notifying defense counsel that this witness suffered from a disability, and the resulting failure of the trial justice to exclude Cole's testimony and allow further investigation constituted error. Although we agree that the prosecution was obligated to disclose Cole's disability, we disagree that further investigation was warranted.

■ The United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963), held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The rationale for this proposition lies in the constitutional guarantees of due process and a fair trial. *Id.* Effective cross-examination can be impeded by the suppression of material evidence. *United States v. Bagley*, 473

**1226**

U.S. 667, 677–78, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481, 490–91 (1985) (plurality opinion by Blackmun, J.).

■ The *Brady* doctrine was later extended to encompass impeachment evidence. *Giglio v. United States*, 405 U.S. 150, 154–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 109 (1972). In reversing the trial court, however, the *Giglio* Court stated that a new trial is not required "whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict.'" *Id.* at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108. (quoting *United States v. Keogh*, 391 F.2d 138, 148 (2nd Cir.1968)). Thus the materiality requirement announced in *Brady* remains essential to the determination of the proper remedy for any nondisclosure. It is important to note, however, that "[a]n interpretation of *Brady* to create a broad, constitutionally required right of discovery 'would entirely alter the character and balance of our present systems of criminal justice.'" *Bagley*, 473 U.S. at 675 n. 7, 105 S.Ct. at 3380 n. 7, 87 L.Ed.2d at 489 n. 7 (quoting *Giles v. Maryland*, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967) (dissenting opinion)).

■ More than twenty years after the *Brady* decision, the United States Supreme Court finally ended the confusion surrounding the varying tests formulated to establish the materiality of nondisclosed evidence. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Nondisclosed evidence is material, whether or not requested by the defense, if there is a reasonable probability that the disclosure of such information would have changed the outcome of the proceeding. *Id.* at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494.

■ The result of these decisions is to place an affirmative obligation upon the prosecutor to disclose material evidence favorable to the accused, a proposition acknowledged in our own state. *In re Ouimette*, 115 R.I. 169, 342 A.2d 250 (1975). We do not follow a strict outcome-determinative approach, however, when addressing questions of materiality. Instead, the blameworthiness of the prosecution in failing to disclose certain evidence will direct the sliding-scale analysis we adopted in *Ouimette* and applied later in *State v. Wyche*, 518 A.2d 907 (R.I.1986). When the nondisclosure is deliberate, the effect on the outcome of a defendant's trial is irrelevant; a new trial must be granted. *Wyche*, 518 A.2d at 910. Deliberate nondisclosure connotes either " 'a considered decision to suppress * * * for the purpose of obstructing,'" or the prosecution's failure " 'to disclose evidence whose high value to the defense could not have escaped * * * [its] attention.'" *Id.* (quoting *United States v. Keogh*, 391 F.2d 138, 146–47 (2nd Cir. 1968)).

■ At the other end of the spectrum is the unintentional nondisclosure. This encompasses evidence that may have been helpful to the defense yet prior to trial was neither requested nor disclosed. In this situation we apply a variation of *Bagley's* outcome-determinative analysis. We held in *Ouimette* that the defendant "must show there is a significant chance that the use and development of the withheld evidence by skilled counsel at trial would have produced a reasonable doubt in the minds of enough jurors to avoid a conviction." 115 R.I. at 179, 342 A.2d at 254–55.

It is this latter standard that we shall apply to the case before us because nothing in the record, aside from the assertions of defendants, indicates that the prosecution deliberately or purposefully withheld this information in order to obstruct our judicial processes. The information relative to Cole's mental capabilities, we hold, was not of the character that would have placed "reasonable doubt" in the minds of the jury. Any information obtained would be relevant solely for the purpose of impeaching the witness's credibility. The trial justice gave defendants ample opportunity to cross-examine Cole relative to her "learning disability," as mandated by *State v. Manocchio*, 496 A.2d 931, 934–35 (R.I.1985) (sufficient cross-examination matter of right). Any additional information relative to her scholastic abilities was completely

immaterial. The trial justice found, and we agree, that:

"[t]he defendants have a constitutional right to be provided with any evidence which exculpates them. The evidence that the defendants are speaking about now is not the kind of exculpatory evidence that carries with it constitutional implications. The evidence that the defendants are speaking about has to do with the ability of the particular witness to be present and to testify for the government and be subjected to cross-examination so that the jury may be made aware of the fact that the witness has learning disabilities, may be of the type of mind that does not grasp what may be occurring at a particular time, and to the extent that the individual does grasp what is occurring at a particular time * * *.

"The defendants have the capability of cross-examining her and showing to the jury that they ought not to give any weight at all, if any weight, they ought not to give any weight at all [*sic*] to her because of the factors that the Court has just enumerated, that she did not have the ability to observe, did not have the ability to remember, doesn't have the ability to recall, doesn't have the ability to communicate and consequently, that the defendants ought not to be penalized by her testimony."

We do conclude, however, that the prosecutor should have been alerted to Cole's deficiencies and accordingly informed defense counsel prior to trial. The inadvertent failure to reveal the condition of this witness remains insufficient to warrant reversal because we do not believe, for the reason stated, that the nondisclosure deprived defendants of a fair trial.

### III

### IMPEACHMENT OF THOMAS DRAWDY

■ Individually, defendant Burke assigns error to the trial justice's allowance of the state to impeach its own witness. The state called upon Thomas Drawdy (Drawdy) to testify concerning the events occurring on June 15, 1985. The prosecution then proceeded to impeach Drawdy's credibility with evidence of past crimes. The defendants objected to this line of questioning as "improper, irrelevant and immaterial." We agree with defendants' contentions; however, the error does not rise to a level requiring reversal.

■ The longstanding rule that a party may not impeach its own witness has been abrogated to facilitate the interests of justice. Rule 607 of the Rhode Island Rules of Evidence provides:

"Who may impeach.—The credibility of a witness may be attacked by any party, including the party calling the witness, except that the party, calling the witness shall not impeach the witness' credit by evidence of bad character unless, in the view of the trial justice, the interests of justice so require."

The rule, however, does not grant counsel an absolute right to attack the credibility of its own witness. In *State v. Vargas*, 420 A.2d 809, 812 (R.I.1980), we held that

"[i]t is now well settled in this jurisdiction * * * that a party who is surprised by his own witness's testimony may be permitted, in the discretion of the trial justice, to confront the witness with prior inconsistent statements. * * * The rule that a party may not ordinarily impeach his own witness may also be relaxed even in the absence of an allegation and finding of surprise when, in the view of the trial justice, the interests of justice so require."

In the case before us we see neither surprise nor an affront to the interests of justice sufficient to have permitted counsel to engage in the impeachment of Drawdy with past convictions. The trial justice was in error to allow the direct examination to proceed in this manner. As we shall explain, however, this error does not warrant a reversal of defendant Burke's conviction.

When substantial rights are unaffected by an error during the course of a trial, that error may be disregarded. Super. R. Crim. P. 52. The defendant Burke contends that the state introduced the record

of Drawdy in order to show the undesirable character of the people with whom defendant was associating. This testimony would offer the jury the adverse inference that "birds of a feather flock together." We disagree.

We find that the trial justice effectively cured any potential prejudice with a curative instruction on the effect of Drawdy's testimony. In addition to explaining the limited purpose for which the evidence was admissible, to impeach credibility, the trial justice stated specifically that "[t]here's no relationship between what this gentleman [Drawdy] may have done in the way of committing crimes and their [defendants'] innocence or guilt. They [defendants] are presumed to be innocent and what he's done in the past has no reflection upon them and you may not draw any inferences with respect to these two defendants."

Accordingly, the initial error of allowing the state to impeach its own witness was rendered harmless by the adequate limiting instruction given to the jury.

## IV

### COCONSPIRACY STATEMENTS

■ Finally defendant St. Pierre claims error in the trial justice's instructions to the jury with respect to threats defendant Burke made to Cole subsequent to the robbery. Cole testified that when she first spoke to the police concerning the events that occurred on June 15, 1985, she did not tell the complete truth. Her reason for the lack of veracity resulted from the fear of reprisal from defendant Burke. The defendant Burke, she stated, "told [her] to keep [her] mouth shut."

In his final charge the trial justice stated "in the event that you find that there was a conspiracy between these two gentlemen, any statements made by Mr. Burke following the robbery may be attributed also to Mr. St. Pierre. That is the nature of the crime of conspiracy." Defense counsel for St. Pierre accordingly noted his objection to such a charge, asserting that the state-

ments in question were made during the concealment phase and were, therefore, not attributable to his client. We agree.

Rule 801(d)(2)(E) of the Rhode Island Rules of Evidence provides that statements made by a coconspirator during and in furtherance of the conspiracy are not inadmissible hearsay. The rule, however, does not mandate the admission of all statements against each coconspirator. The statements must be made "during the course and in furtherance of the conspiracy." Rule 801(d)(2)(E), which became effective in 1987, is identical to its Federal counterpart and codifies our own common law. *See State v. Patriarca*, 112 R.I. 14, 308 A.2d 300 (1973).

In *Patriarca* we considered the admissibility of statements made by a coconspirator after completion of the conspiracy. We held "that declarations of a co-conspirator made after the termination of the conspiracy are admissible only against the declarant. We, like the federal courts, tend to look with disfavor on attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecution." 112 R.I. at 40, 308 A.2d at 316.

The statements before us clearly fall outside the reach of the "nets of conspiracy prosecution" as codified in Rule 801(d)(2)(E). Burke's threats to Cole were made "a couple of days after" the robbery, the object of the conspiracy. The record is devoid of evidence linking St. Pierre to these threats, and therefore, the trial justice's instructions were patently incorrect. Attributing threats of this nature to defendant St. Pierre operates as a substantial injustice that requires a reversal of his conviction.

In view of our holding that the admission of these statements constitutes reversible error, we need not address the defendant St. Pierre's additional claims of error.[6]

For the foregoing reasons the appeal of the defendant Burke is denied and dismissed and his conviction affirmed. The appeal of the defendant St. Pierre is sus-

---

**6.** The defendant Burke, although joining in the request for an opening statement in the trial court, did not raise this issue on appeal, and therefore, we shall not address it.

tained, and the judgment of the trial court is reversed and remanded for a new trial in accordance with this opinion.