November 3, 2023

Jaimie Dawson            :

v.            :

Manuel Ojeda.            :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email: opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Jaimie Dawson        :

v.        :

Manuel Ojeda.        :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  The defendant, Manuel Ojeda (defendant or Ojeda) appeals from an order of a Family Court trial justice, which affirmed the decision and order issued by the General Magistrate of the Family Court.  After reviewing testimony, the General Magistrate granted the motion of the plaintiff, Jaimie Dawson (plaintiff or Dawson),[1] to relocate permanently to the Commonwealth of Massachusetts with the minor child born as a result of the

---

[1] The record contains different spellings of Dawson's first name.  We adopt the spelling used when plaintiff was sworn in to testify, which coincides with the spelling plaintiff used in her own affidavit.

- 1 -

relationship she had with Ojeda.[2]  This case came before the Supreme Court on October 5, 2023, pursuant to an order directing the parties to show cause why the issues raised in this appeal should not be summarily decided.  After examining the memoranda and arguments presented by the parties, we conclude that cause has not been shown and proceed to decide the appeal at this time.  We affirm.

**Facts and Travel**

Dawson and Ojeda began dating in early 2019.  At that time, Dawson lived in Cranston, Rhode Island.  In November 2019, Dawson moved to Manville, Rhode Island,[3] where she resided until moving to Acton, Massachusetts, pursuant to the Family Court's November 18, 2020 order.  During the relationship, Ojeda was married to his current wife, a fact that was known to Dawson.

Prior to the child's birth, Dawson worked as a service manager at McGovern Automotive (McGovern) in Brockton, Massachusetts.  Dawson commuted approximately one hour and thirty-five minutes to and from Manville, Rhode Island; worked six days a week from 6 a.m. to 5 or 6 p.m.; and earned an annual salary of approximately $112,000.  In March 2020, plaintiff began a maternity leave from

---

[2] We refer to the child in a non-identifiable manner in order to preserve some measure of privacy.  We intend no disrespect.

[3] Manville is a village situated within the Town of Lincoln, Rhode Island.  *See e.g.*, *State v. Burke*, 574 A.2d 1217, 1219 (R.I. 1990).

McGovern; and, on April 13, 2020, she gave birth to a son. Shortly after the child's birth, the relationship between Dawson and Ojeda ended.

On April 23, 2020, Dawson filed this action and an *ex parte* motion seeking, *inter alia*, temporary custody and physical possession of the child. The motion also requested that Ojeda be permitted supervised visitation at Dawson's home. The Family Court granted the *ex parte* motion and entered an order awarding Dawson temporary custody and physical possession of the child, with Ojeda permitted supervised visits at Dawson's home.

Dawson's work leave continued through late September 2020, when she received a letter from McGovern advising that it would no longer hold the service manager position for her and that she would be furloughed. Upon learning this information, Dawson contacted McGovern and was advised that a service writer/adviser position was available in Lowell, Massachusetts. Dawson accepted this position and returned to McGovern as a service writer/adviser in late October or early November 2020.

Dawson's return to McGovern, however, was preceded by the filing of the motion that is the subject of this appeal. On October 14, 2020, plaintiff filed a verified emergency motion to relocate to Massachusetts. At this time, Dawson was living in Manville, Rhode Island, with her son, paying $2,000 per month in rent, plus utilities and other expenses. Upon returning to McGovern, plaintiff's commute to

Lowell, Massachusetts, was approximately one hour and forty-five minutes to and from Manville; and plaintiff worked from 7 or 8 a.m. until 3 or 4 p.m., Monday through Friday, in addition to one Saturday a month. While working in Lowell, plaintiff's mother and/or father would travel to Manville to be the primary daycare provider for the infant.

By order dated November 18, 2020, the Family Court granted the emergency motion to relocate and ordered that Dawson "shall move to Acton, Massachusetts and shall stay there until further order of this [c]ourt." The Family Court also granted Ojeda "reasonable rights of visitation to include Monday and Tuesday from 9:00 a.m. until 7:00 p.m. with the parties agreeing to meet at Target in the Lincoln Mall parking lot for both pick-up and drop-off." The Family Court's November 18, 2020 order was temporary in nature, pending a hearing and decision on plaintiff's motion to relocate permanently to Massachusetts.[4]

In or around November 2020, Dawson and her son moved into a three-story townhouse in Acton, Massachusetts, which she shared with her parents. The plaintiff testified that among the reasons for the move was saving money and

---

[4] The record indicates that Ojeda filed a notice to appeal the November 5, 2020 order, which was entered on November 18, 2020. The Family Court subsequently issued an order with the agreement of the parties that "the Motion to Appeal the Magistrate's Decision was timely filed, but is moot because the order from [the] November 5, 2020 hearing was temporary in nature." The order from the November 5, 2020 hearing is not before this Court on appeal.

ensuring daycare for her son, both of which were accomplished by moving into the same home as her parents. During this time, plaintiff remained working at McGovern as a service writer/adviser; and, although promised an annual salary between $70,000 and $80,000, plaintiff related that her actual income was lower because certain performance expectations were not met due to the economic downturn caused by the pandemic.

In January 2021, Dawson left her job at McGovern. The plaintiff explained that the reason for leaving McGovern was that her actual salary was lower than expected, and plaintiff further recounted that she did not search for another job in the automotive industry because of its demanding hours and the time it required her to be away from her son. Instead, Dawson began working at a Dunkin' Donuts located about eight miles from her Acton home. By working at Dunkin' Donuts, plaintiff testified, she was able to reduce her work hours to 6 a.m. until 1 p.m. and be home for lunch and dinner with her son. Dawson related that she valued the reduced work hours because they allowed her to "spend time with my son" and because "[t]ime is something I'm never going to get back."

The hearing on plaintiff's motion to relocate permanently to Massachusetts commenced before the Family Court General Magistrate on August 31, 2021, and continued on October 28, 2021. During the hearing, Dawson and Ojeda were the only testifying witnesses. Among the evidence submitted, Dawson testified that in

October 2020, she was unable to meet her needs and "couldn't pay $2,000 a month in rent." Dawson also testified that moving to Acton, Massachusetts, was beneficial because she was able to save money, spend more time with her son, and have her parents assist with daycare at no cost.

On November 23, 2021, the General Magistrate issued a lengthy written decision, granting plaintiff's motion to relocate permanently to Massachusetts. Significantly, the General Magistrate reviewed the relevant factors, *see infra*, and determined that it was in the child's best interests that Dawson be permitted to relocate permanently to Massachusetts with her son. Ojeda filed a timely appeal to a Family Court trial justice, who affirmed the General Magistrate's decision. In relevant part, the Family Court trial justice concluded that there was "no basis to make a finding that there is any mistake of law or clearly erroneous interpretation of evidence in the within matter." This timely appeal ensued.

**Standard of Review**

On appeal, this Court reviews the Family Court trial justice's affirmance of the General Magistrate's decision and order allowing Dawson and her son to relocate permanently to Massachusetts. "[T]his Court will not disturb the findings of fact made by a justice of the Family Court with respect to the issue of custody and the best interests of the child unless the hearing justice abused his or her discretion in making such findings." *Leon v. Krikorian*, 271 A.3d 985, 989 (R.I. 2022) (quoting

- 6 -

*Andrade v. Andrade*, 252 A.3d 755, 760 (R.I. 2021)). "We will affirm the trial justice's award concerning custody and the best interests of the child unless his or her factual findings overlooked or misconceived material evidence or were clearly wrong." *Id.* (quoting *Andrade*, 252 A.3d at 760). In reviewing a Family Court trial justice's or magistrate's findings, we have recognized that "[i]t is the trial justice who is in the best position to determine what factors regarding relocation may be relevant on a case-by-case basis, and his or her discretion in this regard should not be unduly constrained." *Id.* (brackets omitted) (quoting *Dupré v. Dupré*, 857 A.2d 242, 257 (R.I. 2004)).

**Analysis**

This Court has recognized that "[r]elocation is the subject of much debate and controversy among legal scholars, commentators, mental health professionals, and social scientists." *Dupré*, 857 A.2d at 248. In doing so, we explained that relocation "underscores an often-irreconcilable tension that develops when parents no longer reside together in a single-family unit." *Id.* "One parent may wish to move to pursue educational or employment opportunities, to remarry, to be closer to family, or simply to gain a fresh start; whereas the other parent has an interest in maintaining frequent contact and a continuing relationship with his or her child." *Id.* "To the extent that it can be said that one parent exercises significantly more of such responsibilities than the other, the general stability, well-being and happiness of that

- 7 -

parent's family unit will have a direct bearing on the child's well-being." *Id.* at 256-57.  Conversely, we have observed, "the child's opportunity to maintain a meaningful relationship with the other parent, no matter how diminished that parent's role may be, will undoubtedly have some impact on the child's best interests." *Id.* at 257.

Previously, we referenced various American Law Institute (A.L.I.) principles with approval, including that a "court should allow a parent who has been exercising the clear majority of custodial responsibility to relocate with the child if that parent shows that the relocation is for a valid purpose, in good faith, and to a location that is reasonable in light of the purpose." *Dupré*, 857 A.2d at 255 (quoting *Principles of the Law of Family Dissolution*, A.L.I. ch. 2, § 2.17(4)(a)).  "The A.L.I. Principles further provide that a move for a valid purpose is reasonable unless 'its purpose is shown to be substantially achievable without moving, or by moving to a location that is substantially less disruptive of the other parent's relationship to the child.'" *Id.* at 259 (quoting A.L.I., ch. 2, § 2.17(4)(a)(iii)).

In *Dupré*, this Court articulated the relevant factors to be examined when considering a motion to relocate.  *Dupré*, 857 A.2d at 257-59.  We explained that "parties either seeking or opposing the relocation of their minor children should present relevant evidence concerning the following factors so that the court may make appropriate findings:

"(1) The nature, quality, extent of involvement, and duration of the child's relationship with the parent proposing to relocate and with the non-relocating parent. * * *

"* * *

"(2) The reasonable likelihood that the relocation will enhance the general quality of life for both the child and the parent seeking the relocation, including, but not limited to, economic and emotional benefits, and educational opportunities. * * *

"(3) The probable impact that the relocation will have on the child's physical, educational, and emotional development. Any special needs of the child should also be taken into account in considering this factor. * * *

"(4) The feasibility of preserving the relationship between the non-relocating parent and child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties. * * *

"* * *

"(5) The existence of extended family or other support systems available to the child in both locations. * * *

"(6) Each parent's reasons for seeking or opposing the relocation.

"* * *

"(7) In cases of international relocation, the question of whether the country to which the child is to be relocated is a signatory to the Hague Convention on the Civil Aspects of International Child Abduction will be an important consideration.

"(8) To the extent that they may be relevant to a relocation

inquiry, the *Pettinato* factors also will be significant."[5] *Id.* at 257-59.

We have observed that the list of factors is not exhaustive and that no one factor is dispositive. *See Dupré*, 857 A.2d at 259. Rather, "[e]ach case will present its own unique circumstances that a trial justice must balance and weigh as he or she

---

[5] In *Pettinato v. Pettinato*, 582 A.2d 909 (R.I. 1990), this Court articulated eight factors to consider in determining the best interests of the child:

> "1. The wishes of the child's parent or parents regarding the child's custody.
>
> "2. The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.
>
> "3. The interaction and interrelationship of the child with the child's parent or parents, the child's siblings, and any other person who may significantly affect the child's best interest.
>
> "4. The child's adjustment to the child's home, school, and community.
>
> "5. The mental and physical health of all individuals involved.
>
> "6. The stability of the child's home environment.
>
> "7. The moral fitness of the child's parents.
>
> "8. The willingness and ability of each parent to facilitate a close and continuous parent-child relationship between the child and the other parent." *Pettinato*, 582 A.2d at 913-14 (footnotes omitted).

- 10 -

deems appropriate." *Id.* This Court has also emphasized, "the primary consideration and paramount concern in all matters relating to custody is the best interests of the child." *Id.* at 254; *see also Leon*, 271 A.3d at 989 ("[T]he paramount consideration in relocation cases is the best interests of the child.") (brackets omitted) (quoting *DePrete v. DePrete*, 44 A.3d 1260, 1271 (R.I. 2012)).

In this case, the General Magistrate diligently considered and weighed each relevant *Dupré* factor. The General Magistrate appropriately recognized that the minor child was only nineteen months old at the time of the decision and that plaintiff had been the primary caretaker of the child for the entirety of his young life. Importantly, the General Magistrate determined that Dawson and Ojeda are "caring and loving parents, and both have expressed a desire to be very much involved in his life," and he also determined that relocating permanently to Massachusetts will be "beneficial for [the child's] emotional, social and educational development." The General Magistrate also concluded that it is in the best interests of the child that he and Dawson "be permitted to permanently relocate * * * to the State of Massachusetts." The Family Court trial justice found no error with the General Magistrate's decision.

In support of this appeal, Ojeda claims that the Family Court's decision "overlooked and misconceived material evidence when assessing the relocation" and that allowing Dawson and the minor child to relocate to Massachusetts was "not in

the best interests of the child." In particular, Ojeda asserts that the primary reason for the relocation, namely Dawson's desire to be closer to work, was no longer a valid consideration since plaintiff left McGovern to work at Dunkin' Donuts. Because Dunkin' Donuts locations are pervasive throughout Rhode Island, Ojeda suggests that plaintiff should have looked for employment closer to his established residence in Cranston, Rhode Island. Ojeda adds that the Family Court "assumed without evidence" that Dawson's economic situation was better in Massachusetts than in Rhode Island, that Dawson never looked for housing or employment in Rhode Island, and that the benefits of relocation were "entirely attainable in Rhode Island, where the child c[ould] also be closer to his father." Our review demonstrates ample support for the Family Court's decision.

For example, the General Magistrate determined that "there is no question that [Dawson] seeks to relocate to enhance [her son's] quality of life and for his emotional benefit, as well as for the economic benefits that living close to her family provides." In reaching this conclusion, the General Magistrate referenced Dawson's desire to be closer to her parents, as well as the economic savings and associated benefits, such as "significant daycare cost savings." The General Magistrate further credited Dawson's decision that, when she was unavailable, the child be raised by family members rather than leaving her son in public daycare. Additionally, the testimony confirms the grandparents' support in helping to watch and raise the child,

and it is notable that Ojeda similarly agreed that Dawson's mother would provide childcare, albeit on the condition that the childcare occurred within Rhode Island.

The General Magistrate also concluded that he was "satisfied that a relocation has and will enhance the general quality of life" for Dawson and her son. The General Magistrate appropriately recognized that while earning less money, Dawson has

> "prioritized her son's emotional well-being and she has made adjustments in her living expenses to compensate for the loss of income. [Dawson] is able to spend more time with [her son] and he is being cared for by family rather than strangers when [Dawson] is working. There is a significant daycare cost savings associated with [Dawson's] decision. Both parties testified, [the child] doesn't go without anything. In light of [the child's] age, the educational opportunities are not a factor at this juncture."

In contrast, the testimony revealed that Dawson has no family in Rhode Island and that the only extended family in Rhode Island on the paternal side is Ojeda's wife and Ojeda's approximately twenty-nine-year-old nephew, neither of whom testified concerning their willingness or abilities to provide daycare for the child.

While observing that Ojeda offered plaintiff financial support, as well as indicating that he would change his work schedule to be the primary caregiver, the General Magistrate properly recognized that Dawson's "actions speak much louder than [Ojeda's] words," and that the court "does not see how [Ojeda] could or would ever follow through on this plan in light of where he works and his work

- 13 -

obligations." In sum, the General Magistrate determined that Dawson's "actions of making herself more available for [her son], being close to family and creating a living situation where immediate family are the primary caregivers for [the child], will have a positive impact on [the child's] physical, educational and emotional development both in the immediate years and in later years when he is school age." *See Dupré*, 857 A.2d at 256-57 ("To the extent that it can be said that one parent exercises significantly more of [the parental] responsibilities than the other, the general stability, well-being and happiness of that parent's family unit will have a direct bearing on the child's well-being.").

Moreover, although Ojeda testified that he opposed relocation, at least in part, because he has a distant relationship with his approximately twenty-two-year-old daughter, who relocated to California with her mother at three years of age, the General Magistrate rejected this consideration and recognized that "the circumstances here are very different in that the distance of the two moves is not comparable and are at the extreme end of the spectrum." The General Magistrate considered the added challenges that distance brings to a parent-child relationship, but explained that the distance between Ojeda's residence and Acton, Massachusetts, was approximately one hour and that "[t]here are divergent places within the State of Rhode Island that require a similar commute time * * *."

Finally, the Family Court record reflects the General Magistrate's conclusion that Ojeda's relationship with his son will continue, as demonstrated by plaintiff's willingness to make parenting arrangements around Ojeda's work schedule, transporting the child to the pick-up and drop-off location in Lincoln, Rhode Island, and assuring that Ojeda is informed about his son's medical appointments. The General Magistrate further observed that Ojeda's work location in Narragansett, Rhode Island, long work hours, and work schedule posed more of an impediment to being available to take part in his son's activities than the travel distance.

While Ojeda faults the Family Court for failing to consider that Dawson did not investigate the economic benefits of staying in Rhode Island, including the job market, the housing market, or childcare opportunities, the General Magistrate's findings of fact and conclusions of law ably address this contention. In any event, it is well-settled that "[t]he trial justice need not refer to every piece of evidence, rather [the trial justice] must refer to the specific evidence that prompted his * * * decision." *Leon*, 271 A.3d at 989 (quoting *Saltzman v. Saltzman*, 218 A.3d 551, 558 (R.I. 2019)).

Having carefully reviewed the Family Court record, we discern no error in the trial justice's affirmance of the General Magistrate's decision to allow Dawson and her son to relocate permanently to Massachusetts. As we noted in *Dupré*, "[o]ur review of past cases only confirms the time-honored axiom that the primary

- 15 -

consideration and paramount concern in all matters relating to custody is the best interests of the child." *Dupré*, 857 A.2d at 254. "The determination of what is in the best interests of a particular child is appropriately placed in the sound discretion of the trial justice." *Id.* at 256. The Family Court did not err when it affirmed the General Magistrate's decision and order, which concluded that allowing the plaintiff to relocate permanently to Massachusetts was in the child's best interests.

## Conclusion

For the reasons set forth herein, we affirm the order of the Family Court. The record in this case is remanded to the Family Court.



## STATE OF RHODE ISLAND

### SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Jaimie Dawson v. Manuel Ojeda. |
| **Case Number** | No. 2022-269-Appeal. (P 20-1689M) |
| **Date Opinion Filed** | November 3, 2023 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer from Lower Court** | Associate Justice Richard A. Merola |
| **Attorney(s) on Appeal** | For Plaintiff: Frank S. Lombardi, Esq. |
| | For Defendant: Derek M. Gillis, Esq. |