Robert E. DUPRÉ

v.

Melanie S. DUPRÉ.

No. 2002–300–Appeal.

Supreme Court of Rhode Island.

July 30, 2004.

Lauren E. Jones, Providence, for Plaintiff.

Karen A. Pelczarski, Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, and SUTTELL, JJ.

## OPINION

SUTTELL, Justice.

Huahine [1]—"Garden of Eden * * * with its lush forests, untamed landscape, and

---

1. Huahine (pronounced hoo-ah-hee-nay) is one of the Society Islands of French Polyne-sia. It is about 100 miles northwest of Tahiti.

quaint villages, is one of Polynesia's best-kept secrets."[2] Huahine—its very name evokes images of endless white sand beaches, azure blue and emerald green waters and soft caressing breezes—a true tropical paradise. Unfortunately, our interest in Huahine is not for travel or adventure. Our interest in the island is rather more pedestrian, yet nevertheless of vital significance. In this appeal from a judgment of the Family Court, Huahine is the focal point of a contested dispute between two divorced parents, both of whom are fit and caring parents, over the appropriate placement of their two children.

Of the many emotional consequences attendant upon the dissolution of a marriage, perhaps none is more vexatious than that precipitated by the desire of a parent to relocate with a minor child of the marriage. From the child's perspective, a once-single family has become two, and the relationship and well-being of each of these family units necessarily will have a direct impact on the well-being of the child. Moreover, the desire and right of one parent to move to pursue new opportunities undoubtedly will conflict with the desire and right of the other parent to maintain a close relationship with his or her child. The issue of post-divorce relocation is a complex, but increasingly prevalent, occurrence in today's mobile society.

Relocation is a perplexing problem under the best of circumstances. Few cases, however, present the issues so acutely as this appeal. Not only do the parties enjoy joint legal custody, but also they were awarded joint physical placement by the terms of a property settlement agreement that was incorporated into the decision pending entry of final judgment. Of particular significance to our inquiry are the logistical challenges facing the parties and their two children. Father resides in Jamestown, Rhode Island, and mother in Huahine, more than 6,400 miles and twenty-four hours travel time distant. Even in an age of instant communications and global transportation, the logistics are daunting.

We also recognize that neither statutory nor previous Rhode Island case law provides much guidance in this very troublesome area. Here, after finding that "mother would best serve the emotional and physical needs of the children," the Family Court ruled that she had failed to show "a compelling reason" to reside in Huahine. It therefore denied her request to move the children there, and awarded placement to father. Because we conclude that the Family Court incorrectly applied a compelling-reason standard, we vacate the judgment and remand the case for further proceedings.

### Facts and Travel

Robert E. Dupré, Jr., (Robert or plaintiff) and Melanie S. Dupré (Melanie or defendant) were married in 1987 in the south of France. Before their marriage, they had lived together for approximately seven months in 1979 in French Polynesia, both in Papeete, Tahiti, and on the island of Moorea. In September 1979, they moved to Aix–en–Provence in France, where they resided for approximately one year.

In 1980 Robert purchased an apartment building in the Armory District of Providence, and the parties moved to Rhode Island. According to Melanie, Robert told her that if they worked very hard for three or four years renovating the building, they would have a source of income to enable them to return to French Polynesia. Af-

---

2. Official website of Tahiti Tourism at http://www.tahiti-tourisme.com/islands/huah-ine/ description.asp. Last visited July 19, 2004.

ter a couple of years, however, Robert purchased a second building. Melanie testified that although she supported Robert in this second project, she "got very frustrated" and told him "time and time again" that she was unhappy living in Providence and wanted to return to French Polynesia.

In 1987 Melanie became pregnant, and the parties decided to marry. They remained living in Providence, and Robert continued to acquire and renovate apartment buildings. At the time of trial, Robert operated a very successful business, the Armory Revival Company, with approximately thirty employees.

Melanie is an artist. She testified that she was able to support herself in Papeete and France by selling her pen and ink drawings and paintings, but that it was a struggle for her in Providence because she did not "feel inspired by the landscape here." She said that she tried to find a niche for herself in the New England area, but "was never able to hook up with either a rep or a gallery where [she] felt [her] work could easily sell." She displayed her work at an average of two art shows a year, but generated very little income therefrom. Sometimes she vacationed in the south of France with the children "just to get some inspiration back because [she] felt so deprived of inspiration." For a year and a half she also worked as a real estate agent, earning approximately $45,000, to help her husband's company and to put some money aside for her trips to Tahiti.

Melanie's discontent and desire to leave the New England area was not lost upon Robert. He did not wish to relocate, however; his business was thriving, and his family, friends, and community were in Rhode Island. According to Robert, Melanie's desire to live somewhere else ultimately led to the dissolution of their marriage. In August 1999, he filed for divorce.

On August 23, 1999, a consent decree was entered by agreement of the parties in which Melanie was permitted to remove the children to Tahiti for the 1999–2000 school year. When they returned to Rhode Island, another order was entered, providing for alternating placement of the children in Rhode Island and also permitting Melanie to take the children to Tahiti for approximately two months. The divorce was scheduled for hearing on April 4, 2001, on which date the parties executed a property settlement agreement. That agreement was incorporated but not merged in the decision pending entry of final judgment that was entered on April 20, 2001. Final judgment was entered on December 31, 2001.

The parties agreed to joint custody and shared physical possession and placement of their two minor children, then nine and thirteen years old, in accordance with a schedule. The schedule provided for placement with Melanie in Rhode Island for the remainder of the school year, then with her in Huahine during the summer until August 19, 2001, after which time they would reside primarily with Robert. Notwithstanding the interlocutory order that the children would reside primarily with Melanie in Rhode Island until the end of the school year, she returned to Huahine on April 29, 2001. Because Robert was out of the country at the time, she left the children separately with a friend and a neighbor until he returned. The property settlement agreement and court order also provided that "if the parties cannot agree as to the primary placement of the children for the academic year 2001–2002 this issue shall be determined by the Providence County Family Court."

The parties indeed could not agree, and submitted the issue of primary placement

to the Family Court. In addition, Melanie filed a motion to modify the visitation schedule in light of her desire that the children be placed with her in Huahine. Hearings were held in October and November 2001. Both parties testified, and the trial justice interviewed the children *in camera*. The defendant also presented as an expert witness Brian Hayden, Ph.D. (Dr. Hayden), a child psychologist who had been asked to do an evaluation and make recommendations with respect to the children's placement for the 2000–2001 academic year. He testified that he interviewed each parent individually, had each complete a psychological questionnaire, spoke to both children, and assessed the interaction between the children and each parent.

Doctor Hayden further testified that Melanie seemed to have a more significant parent/child relationship with the children, and was viewed by them "as their primary caregiver, and the person that provided, at least to them, the greatest sense of psychological security." Although he considered Robert to be a good father, he thought that the children were far more relaxed with their mother and had "a greater exchange of emotion and ideas and play" with her. He said it was clear, however, that they loved their father and enjoyed their time with him.

Doctor Hayden also said that he had seen the children only a week before the trial at a time when they had been living with Robert. Doctor Hayden thought that they were not very happy living with their father. They felt they were not seeing very much of him and were frustrated by their inability to communicate with their mother by E-mail. One complained about his father's disciplinary techniques, and the other "vehemently wanted to be with her mother."

When Dr. Hayden was asked whether he had an opinion about which parent should be the primary caregiver, he responded,

"as long as these comments are understood in terms of the children [having] made a clear statement that they would like to live with their mother. I don't know where that would be, but I would support, or at least articulate that their desire is well-founded on their experience with their mother, and they have been consistent over the last thirteen months that the primary parent from their vantage point has been their mother."

He added, "I would be in favor of them living with their mother without any statement as to where that is, but state living with her would be in the best interests of the children." Doctor Hayden also allowed, however, that ideally children thrive on having contact with both parents, that the quality of a child's relationship with a parent can be affected by the frequency and consistency of contact, that it is also important to have relationships with extended family members, and that "what's best for any child[ ] is for them to have [ ] consistent and regular contact with both parents."

With respect to the possibility of Melanie's remaining in Rhode Island, Dr. Hayden testified that it was his understanding that she had considered it, but that it was not a viable option for her. He also indicated that he understood her desire to live in Huahine to be not a want but a need, and that "she feels profoundly certain about that need." At the time of the hearing, Melanie was living primarily in Huahine where she had leased a three-bedroom house for three years. In contrast to her life in Huahine, which she described as "blissful," she testified that living in New England made her physically

ill, "very depressed and unhappy," "like a plant without water * * * shriveled and dead," and on the edge of a nervous breakdown.

In his decision, the trial justice determined that, by virtue of the property settlement agreement and decision pending entry of final judgment, the court was to address the issues of custody and placement *de novo*. He undertook a "best interest of the child" analysis, and carefully reviewed the factors enumerated in *Pettinato v. Pettinato*, 582 A.2d 909 (R.I.1990). After doing so, he ruled:

> "[T]he court finds that the best interests of the children will be served by awarding joint custody to the parents. Additionally, this court is satisfied that the Defendant mother would best serve the emotional and physical needs of the children. These children will need to continue their development in accordance with the manner that was established prior to the divorce. This can only be effectuated by placing the children in the possession of their mother."

He then added:

> "The court has concerns regarding the children residing in Huahine. In order for the Defendant to remove the children to Huahine, she must demonstrate (a) a compelling reason and (b) it is [in] the children's best interest. * * * The court finds that insufficient evidence has been provided to warrant a finding that there is a compelling reason for Mrs. Dupre to reside in Huahine. Therefore, the court will not ad[d]ress whether or not such a move is in the child's best interest."

Accordingly, Melanie's request to relocate the children was denied, Robert was awarded placement of the children, and Melanie awarded all reasonable rights of visitation, including "ample visitation for all of the children's school and summer vacations, [if she] chooses to move to Huahine."

The defendant filed a motion for a new trial, which was denied, and appealed from the Family Court judgment.[3] Because we conclude that the trial justice incorrectly applied a compelling-reason standard with respect to the issue of relocation, we vacate. It long has been established that in awarding custody, placement, and visitation rights, the "foremost consideration" is the best interests of the child.

## Analysis

### I

Relocation is the subject of much debate and controversy among legal scholars, commentators, mental health professionals, and social scientists. It underscores an often-irreconcilable tension that develops when parents no longer reside together in a single-family unit. One parent may wish to move to pursue educational or employment opportunities, to remarry, to be closer to family, or simply to gain a fresh start; whereas the other parent has an interest in maintaining frequent contact and a continuing relationship with his or her child.

A survey of our sister states reveals a lack of uniformity and much fluidity in their respective approaches to relocation. Traditional policies disfavored relocation and some courts imposed presumptions in favor of the nonrelocating parent. *See, e.g., Pollock v. Pollock*, 181 Ariz. 275, 889 P.2d 633, 635 (Ct.App.1995); *McAlister v.*

---

**3.** An order reflecting the trial justice's written decision had not been entered when the case was docketed in the Supreme Court. We remanded for entry of an order. On June 28, 2004, an order incorporating the trial justice's decision "as is set forth in its entirety" was entered *nunc pro tunc* December 11, 2001.

*Patterson,* 278 S.C. 481, 299 S.E.2d 322, 323 (1982). Other states have created a presumption in favor of relocation either by statute or decisional law. *See, e.g.,* Minn.Stat. § 518.18(d) (2002) (presumption that court will retain the existing primary placement); Okla. Stat. Ann. tit. 10, § 19 (West 1998) (in absence of a showing of prejudice to the rights or welfare of a child, a custodial parent has a presumptive right to change their child's residence); S.D. Codified Laws § 25–5–13 (Michie 1999) (relocation should be permitted so long as removal does not prejudice the rights or welfare of the child); Wis. Stat. Ann. § 767.327(3)(a)2.a (West 2001) (rebuttable presumption that continuing the current custody arrangement is in the best interests of the child); *Hollandsworth v. Knyzewski,* 353 Ark. 470, 109 S.W.3d 653, 658 (2003); *In re Marriage of Burgess,* 13 Cal.4th 25, 51 Cal.Rptr.2d 444, 913 P.2d 473, 478 (1996); *Jaramillo v. Jaramillo,* 113 N.M. 57, 823 P.2d 299, 303 (1991) (rebuttable presumption that relocation with custodial parent is in best interest of child).

Some courts have adopted a burden-shifting approach for determining cases in which a parent with primary physical custody seeks to relocate. Under this approach, the initial burden devolves upon the relocating parent to demonstrate a legitimate or good faith reason for the move. Once a *prima facie* case has been made, the burden shifts to the nonrelocating parent to show that the proposed move is not in the child's best interests. *See, e.g., Ireland v. Ireland,* 246 Conn. 413, 717 A.2d 676, 682 (1998); *Baures v. Lewis,* 167 N.J. 91, 770 A.2d 214, 230–31 (2001).

Although the several states have taken divergent approaches to the issue of relocation, it is clear that traditional policies that discouraged relocation are increasingly being replaced by a less restrictive view

that favors the right of a parent exercising physical custody to relocate the child. This growing trend in relocation law is well illustrated by the following cases.

In *Hollandsworth,* 109 S.W.3d at 663, the Arkansas Supreme Court recently held "that relocation alone is not a material change in circumstance" and pronounced "a presumption in favor of relocation for custodial parents with primary custody. The noncustodial parent should have the burden to rebut the relocation presumption," *id.,* and "[t]he custodial parent no longer has the obligation to prove a real advantage to herself or himself and to the children in relocating." *Id.* Rather, the trial court should consider such factors as:

> "(1) the reason for the relocation; (2) the educational, health, and leisure opportunities available in the location in which the custodial parent and children will relocate; (3) visitation and communication schedule for the noncustodial parent; (4) the effect of the move on the extended family relationships * * *; and, (5) preference of the child, including the age, maturity, and the reasons given by the child as to his or her preference." *Id.* at 663–64.

Historically, New York was considered to be one of the more restrictive jurisdictions with respect to relocation. A policy had developed requiring a three-step inquiry. If it could be established that the proposed move would disrupt the nonrelocating parent's "regular and meaningful access to and interaction with his or her children," the relocating parent must demonstrate "exceptional circumstances" to justify the move, and "establish that the relocation is in the best interests of the child." *See, e.g., Lavane v. Lavane,* 201 A.D.2d 623, 608 N.Y.S.2d 475, 475–76 (1994) (mem.) (quoting *Matter of Radford v. Propper,* 190 A.D.2d 93, 597 N.Y.S.2d 967, 972–73 (1993)). This test was reject-

ed, however, in *Tropea v. Tropea,* 87 N.Y.2d 727, 642 N.Y.S.2d 575, 665 N.E.2d 145, 150 (1996), where the court held that: "each relocation request must be considered on its own merits with due consideration of all the relevant facts and circumstances and with predominant emphasis being placed on what outcome is most likely to serve the best interests of the child." The *Tropea* court further identified various factors that the trial courts should consider including:

> "each parent's reasons for seeking or opposing the move, the quality of the relationships between the child and [both] parents, the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent, the degree to which the custodial parent's and child's life may be enhanced economically, emotionally and educationally by the move, and the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements." *Id.* at 151.

In *In re Marriage of Burgess,* 51 Cal. Rptr.2d 444, 913 P.2d at 479, the California Supreme Court held that a parent with joint legal custody but sole physical custody "bears no burden of establishing that [the move] is 'necessary.'" The court then added:

> "[T]he 'necessity' of relocating frequently has little, if any, substantive bearing on the suitability of a parent to retain the role of a custodial parent. A parent who has been the primary caretaker for minor children is ordinarily no less capable of maintaining the responsibilities and obligations of parenting simply by virtue of a reasonable decision to change his or her geographical location." *Id.* at 481.

In acknowledging that "bright line rules in this area are inappropriate" and that "each case must be evaluated on its own unique facts," the court enumerated certain factors that might be considered, such as "the nature of the child's existing contact with both parents—including *de facto* as well as *de jure* custody arrangements—and, the child's age, community ties, * * * health and educational needs" and where appropriate, the preferences of the child. *Id.* at 483. (Emphasis added.)

The California Court recently concluded, however, in *In re Marriage of LaMusga,* 32 Cal.4th 1072, 12 Cal.Rptr.3d 356, 88 P.3d 81, 98 (2004), that a parent seeking to prevent relocation need not establish that a change of physical custody is "essential" to prevent detriment to the child from the proposed move. The court noted that:

> "the noncustodial parent bears the initial burden of showing that the proposed relocation of the children's residence would cause detriment to the children, requiring a reevaluation of the children's custody. The likely impact of the proposed move on the noncustodial parent's relationship with the children is a relevant factor in determining whether the move would cause detriment to the children and, when considered in light of all of the relevant factors, may be sufficient to justify a change in custody. If the noncustodial parent makes such an initial showing of detriment, the court must perform the delicate and difficult task of determining whether a change in custody is in the best interests of the children." *Id.* at 84–85.

A series of cases that interpret a New Jersey statutory provision that prohibits relocation in certain circumstances except "upon cause shown" highlights the evolving nature of relocation law. Recognizing that "the interests of the child are closely interwoven with those of the custodial parent" and that such parent "is entitled, to the greatest possible extent, to the same

freedom to seek a better life for herself or himself and the children as enjoyed by the noncustodial parent," the New Jersey Court held that the parent seeking to relocate "must show that there is a *real advantage* to that parent in the move and that the move is not inimical to the best interests of the children." *Cooper v. Cooper*, 99 N.J. 42, 491 A.2d 606, 612, 613 (1984). (Emphasis added.) Only after those threshold requirements are established should the court consider visitation and other factors to determine whether the custodial parent had sufficient cause to permit removal. *Id.* at 613.

Four years later, the court modified the "real advantage" requirement, and said, "Motives are relevant, but if the custodial parent is acting in good faith and not to frustrate the noncustodial parent's visitation rights, that should suffice." *Holder v. Polanski*, 111 N.J. 344, 544 A.2d 852, 855, 857 (1988). It further held that removal should not be denied solely to maintain the same visitation schedule, provided that reasonable visitation is available. *Id.* at 857. In *Baures*, 770 A.2d at 229, the New Jersey Court clarified the "template for a removal case." The parent seeking to move "should initially produce evidence to establish *prima facie* that (1) there is a good faith reason for the move and (2) that the move will not be inimical to the child's interest." *Id.* at 230. "Once [the] *prima facie* case has been adduced, however, the burden of going forward devolves upon the noncustodial parent who must produce evidence opposing the move as either not in good faith or inimical to the child's interest." *Id.* at 231.

The court in *Kaiser v. Kaiser*, 23 P.3d 278, 284–85 (Okla.2001), summarized the status of relocation law among the states as follows:

"The majority of jurisdictions which have considered this subject have adopted approaches which favor the custodial parent's right to move away from the state with their child even though they do not have a presumptive right to relocate statute * * *. While the relevant statutory enactments which are placed at issue in those cases vary widely from state to state and some states have no applicable statutes, the decisions are generally based on judicial recognition of the post-divorce new family unit, and stability and continuity of the child's relationship with his primary custodian as the most important factor affecting the child's welfare. These courts also recognize that the well-being of the child is fundamentally interrelated with the well-being of the custodial parent, and that parent is the best person to make decisions affecting the child and the new family group, such as where they will reside. The courts therefore accord those childrearing decisions deference, and hold that judicial intervention in that decision making process should be limited to only the most extreme circumstances."

## II

■ We now turn to the status of Rhode Island law as it relates to relocation cases. Other than the general prescription set forth in G.L.1956 § 15–5–16(d)(1) that "the court shall provide for the reasonable right of visitation by the natural parent not having custody of the children, except upon the showing of cause why the right should not be granted," the Legislature has articulated no presumptions, standards or criteria that apply specifically to relocation issues.[4] Few principles are

---

4. General Laws 1956 § 15–5–16(g)(6) provides, however, that in the context of domestic violence "[t]he fact that a parent is absent or relocates because of an act of domestic or

more firmly established in the law, however, than that in awarding custody, placement, and visitation rights, the "paramount consideration" is the best interests of the child. *Africano v. Castelli*, 837 A.2d 721, 728 (R.I.2003) (per curiam).

In light of the extensive litigation throughout the country, there is a surprising dearth of reported cases in Rhode Island that address the issue of relocation. In *Leighton v. Leighton*, 48 R.I. 195, 195, 136 A. 443, 443 (1927), a mother was awarded custody of three minor children and the sum of $12 per week as alimony. After she moved with the children to Massachusetts, the father sought to suspend his alimony payments until the children were brought back to Rhode Island. *Id.* In dicta, the Supreme Court said:

"if it were necessary for the protection of the welfare of the children or the enforcement of any right of the father to see his children, the Superior Court has the right to suspend an order for alimony until the children of the parties are returned to this State; but nothing was presented tending to show that the welfare of the children would be improved by returning them to Rhode Island or that the father is being deprived of any right. The custody of the children has been taken from the father and he has no right to dictate as to their residence. No reason was even suggested for coercing the mother to reside within this State." *Id.* at 196, 136 A. at 443.

In *Lawrence v. Lawrence*, 85 R.I. 13, 14, 125 A.2d 218, 219 (1956), the final decree granted mother custody of two children, and allowed her to take the children to her permanent home in New York. When she moved to Ohio several years later, father filed a petition to suspend child support

payments. *Id.* at 15, 125 A.2d at 219. The petition was denied. *Id.* at 16, 125 A.2d at 219. In reviewing the father's eight reasons of appeal, the Court said, "We shall consider all these points together, since there is only one main issue presented for our consideration, namely, the welfare of the children." *Id.* at 16, 125 A.2d at 219–20. Then, noting that ordinarily a custodial parent should first obtain a court order before removing the children, the Court said, "Nor is there any evidence that it is for the best interests of the children to suspend the payments for their support or to force [mother] to return the children to New York or Rhode Island, or to separate them from their mother with whom they have lived since birth." *Id.* at 17, 125 A.2d at 220.

Shortly thereafter the Court issued its opinion in *Loebenberg v. Loebenberg*, 85 R.I. 115, 121, 127 A.2d 500, 503 (1956), which involved a joint custodial relationship, wherein the Court said, "the controlling factor in cases between parents, as here, is always the best interest of the child for the time being."

In *Chatelain v. Chatelain*, 93 R.I. 136, 139, 172 A.2d 332, 333 (1961), the mother was granted permission by the Superior Court to remove the children temporarily to Switzerland, and father's right of visitation temporarily was suspended. On appeal, the Court noted that while a right of visitation is of great importance, "[t]he welfare of the child is the paramount consideration in the determination" of a motion to remove the child. *Id.* at 141, 172 A.2d at 334. "When it appears that to sustain such a right of visitation would adversely affect the welfare of the child, that right, being subordinate to the child's

family violence by the other parent shall not weigh against the relocating or absent parent

in determining custody and visitation."

welfare, must yield thereto." *Id.* at 141–42, 172 A.2d at 334–35. In the *Chatelain* case, the Court held that the trial justice had properly subordinated father's right of visitation to the salutary effects on the welfare of the children of an approximate two-year stay in Switzerland. *Id.* at 142, 172 A.2d at 335.

A custodial father removed his young daughter to Israel in apparent derogation of the mother's visitation rights in *Goldstein v. Goldstein*, 115 R.I. 152, 152, 341 A.2d 51, 51 (1975). Three years later, the mother, having enlisted the cooperation of the Supreme Court of Israel, succeeded in enforcing the return of the child to Rhode Island. *Id.* at 152–53, 341 A.2d at 52. After a hearing in Family Court, the trial justice ruled that it was in the child's best interests to remain in her father's custody, and that father be allowed to reside with her in Israel. *Id.* at 154, 341 A.2d at 52. This Court affirmed, noting that "the polestar for the trial justice's guidance was what in the circumstances of this particular case was best for the welfare of this 9½ year-old girl." *Id.*

*McLee v. McLee*, 121 R.I. 491, 492, 399 A.2d 1251, 1251 (1979), involved a motion by the father to enjoin the mother from removing the minor child to California, or in the alternative to suspend child support. Mother was represented by counsel at the hearing, but was not present herself. *Id.* The trial justice, satisfied that she had already left the state, suspended father's child support obligation without hearing any testimony on the child's needs and welfare. *Id.* at 493, 399 A.2d at 1252. In reversing, the Supreme Court reasoned that "in resolving this type of dispute the court should neither discipline the wife for her alleged shortcomings, nor reward the husband for any wrongs which he may have suffered. The court's 'primary interest' * * * should be what is best for the children." *Id.* at 494, 399 A.2d at 1252 (citing *Ruquist v. Ruquist*, 367 Mass. 662, 327 N.E.2d 742, 744 (1975)).

A joint custodial mother's motion to modify the amended final decree was the subject of *Kenney v. Hickey*, 486 A.2d 1079, 1081 (R.I.1985). Mother initially had been awarded physical possession of three children, but transferred physical custody to father by a consent decree when her new husband relocated to Florida to pursue employment opportunities. *Id.* A year and a half later, she sought to regain physical custody of the children, arguing that her living situation in Florida had stabilized. *Id.* In affirming the trial justice's decision awarding sole custody to the mother, the Court said, "Having determined that a sufficient change in circumstances existed and having set forth the relevant findings of fact, the trial justice properly proceeded to render his decision based upon the appropriate standard, that is, the best interests of the children." *Id.* at 1083.

In the case before us, the trial justice relied upon *Garrison v. Mulcahy*, 636 A.2d 732 (R.I.1993) (mem.), to support his ruling that Melanie must demonstrate a compelling reason to remove the children to Huahine. In light of the cases heretofore cited, however, we find *Garrison* to be a less than compelling precedent. We first note that *Garrison* is not a full opinion of the Court, but rather an order, which is generally reserved for more summary proceedings. It is not the type of vehicle commonly utilized by the Court for pronouncing new standards or even modest departures from past precedent.

More significantly, we are not persuaded that *Garrison* established a compelling-reason test applicable in relocation cases. In that case, the mother had filed a complaint requesting a modification of father's visitation rights because of her anticipated

relocation out of state. *Garrison,* 636 A.2d at 733. Father counterclaimed, seeking to restrain and enjoin mother from removing the minor child outside the jurisdiction of Rhode Island on a permanent basis. *Id.* Mother's husband testified that his job prospects with his current employer in Rhode Island were "50/50" and that he had been offered a job in Indiana in his family's business. *Id.* They both acknowledged, however, that they would stay in Rhode Island if not granted permission to relocate the child. *Id.* An expert witness opined that he would not advise that the child be removed unless there was a compelling reason to leave the area. *Id.* Without any discussion whatsoever the Court held that "the trial justice was justified in denying the petition to allow the removal of the child from the jurisdiction on the basis that there was no compelling reason to do so." *Id.* We agree with defendant, who asserts in her brief that the trial justice's factual finding that there was no compelling reason to allow the relocation merely satisfied the condition of the expert's opinion, particularly in light of mother's admission that she would stay in Rhode Island if denied permission to relocate the child. Significantly, the Court also said that "mother did not establish that moving to Indiana would be in the child's best interests." *Id.* We discern no basis in *Garrison* for the creation of a compelling-reason standard that would trump a "best interests" analysis.

In the more recent case of *D'Onofrio v. D'Onofrio,* 738 A.2d 1081, 1082 (R.I.1999)

(per curiam), a decision pending entry of final judgment awarded joint custody to both parents, but physical placement to mother. Before final judgment was entered mother decided to move to England to reside with her soon-to-be husband. *Id.* The parties agreed to modify the interlocutory order and enter final judgment awarding placement to father. *Id.* Shortly thereafter, mother requested that she be awarded physical placement and be allowed to relocate the child to England. *Id.* The Family Court denied her request on the ground that she had failed to show a substantial change of circumstances warranting a change in the custody order. *Id.* This Court affirmed. *Id.* at 1084.

Our review of past cases only confirms the time-honored axiom that the primary consideration and paramount concern in all matters relating to custody is the best interests of the child. The court, of course, must provide reasonable rights of visitation to the nonrelocating parent in light of the extant circumstances, but this is generally implicit in any "best interests" analysis. No authority exists, however, for the creation of a "compelling-reason" standard. A parent's ability to relocate for legitimate reasons should not be burdened by having to demonstrate that such reasons are also "compelling," provided that the relocation is in the child's best interests.

### III

Numerous law review articles,[5] legal

5. *See, e.g.,* Kathryn E. Abare, *Protecting the New Family: Ireland v. Ireland and Connecticut's Custodial Parent Relocation Law,* 32 Conn. L.Rev. 307 (1999); Caroline Ritchie Heil, *Relocation Cases as Change in Custody Proceedings, "Judicial Blackmail" or Competing Interests Reconciled?,* 51 S.C. L.Rev. 885 (2000); Judge Thomas A. James, Jr., *Custody Relocation Law in Pennsylvania: Time to Re-*

*visit and Revise Gruber v. Gruber,* 107 Dick. L.Rev. 45 (2002); Charles P. Kindregan, Jr., *Family Interests in Competition: Relocation and Visitation,* 36 Suffolk U.L.Rev. 31 (2002); Janet Leach Richards, *Children's Rights v. Parent's Rights: A Proposed Solution to the Custodial Relocation Conundrum,* 29 N.M. L.Rev. 245 (1999); Edwin J. Terry et al.,

commentators,[6] mental health professionals and social scientists[7] have contributed to the discourse on relocation. Two well-respected legal organizations, the American Law Institute and the American Academy of Matrimonial Lawyers, also have attempted to bring a measure of uniformity to this area of family law.

The American Law Institute (A.L.I.) has addressed the issue of relocation in its Principles of the Law of Family Dissolution (Principles), which has been praised as "a work in progress, engaging the thought and time of many scholars, practitioners and judges. * * * [It is] a serious attempt by the ALI to grapple with the complexity of the best interest standard and to bring to the analysis the accrued wisdom of experience." Barbara B. Woodhouse, *Child Custody in the Age of Children's Rights: the Search for a Just and Workable Standard*, 33 Fam. L.Q. 815, 830 (1999). The A.L.I. Principles reflect "the policy choice that a parent, like any other citizen, should be able to choose his or her place of residence, and that the job of rearing children after divorce should not be made too financially or emotionally burdensome to the parent who has the majority share of custodial responsibility." *Principles of the Law of Family Dissolution*, A.L.I. ch. 2, § 2.17 cmt. *d* (LexisNexis 2002). The A.L.I. Principles provide that: "The court should allow a parent who has been exercising the clear majority of custodial responsibility to relocate with the child if that parent shows that the relocation is for a valid purpose, in good faith, and to a location that is reasonable in light of the purpose." *Id.* at § 2.17(4)(a).

The American Academy of Matrimonial Lawyers (Academy) has proposed a Model Relocation Act (Model Act) that "is meant to serve as a template for those jurisdictions desiring a statutory solution to the relocation quandary." *Perspectives on the Relocation of Children*, 15 J. Am. Acad. Matrim. Law. 1, 2 (1998). Among its recommendations, the Model Act identifies seven nonexclusive factors that courts should consider in determining relocation issues.[8]

*Relocation: Moving Forward or Moving Backward*, 31 Tex. Tech L.Rev. 983 (2000).

6. *See, e.g.*, Gary A. Debele, *A Children's Rights Approach to Relocation: A Meaningful Best Interests Standard*, 10 J. Am. Acad. Matrim. Law. 75 (1998).

7. *See, e.g.*, Judith S. Wallerstein and Tony J. Tanke, *To Move or Not to Move: Psychological and Legal Considerations in the Relocation of Children Following Divorce*, 30 Fam. L.Q. 305 (1996). Richard A. Warshak, Ph.D., *Social Science and Children's Best Interests in Relocation Cases: Burgess Revisited*, 34 Fam. L.Q. 83 (2000).

8. The Model Act entitled "Factors to Determine Contested Relocation" provides:

"In reaching its decision regarding a proposed relocation, the court shall consider the following factors:

(1) the nature, quality, extent of involvement, and duration of the child's relationship with the person proposing to relocate and with the non-relocating person, siblings, and other significant persons in the child's life;

(2) the age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child;

(3) the feasibility of preserving the relationship between the non-relocating person and the child through suitable [visitation] arrangements, considering the logistics and financial circumstances of the parties;

(4) the child's preference, taking into consideration the age and maturity of the child;

(5) whether there is an established pattern of conduct of the person seeking the relocation, either to promote or thwart the relationship of the child and the non-relocating person;

(6) whether the relocation of the child will enhance the general quality of life for

The national trend toward a less restrictive approach toward relocation is fueled in large measure by social studies suggesting that the psychological welfare of a child depends more on the well-being of the family unit with whom the child primarily resides than it does upon maintaining frequent and regular contact with the other parent. *See, e.g.,* Janet M. Bowermaster, *Sympathizing with Solomon: Choosing Between Parents in a Mobile Society,* 31 U. Louisville J. Fam. L. 791, 884 (1992) (custodial parents should be allowed to relocate with their child in good faith to pursue "their best opportunities"); Judith S. Wallerstein & Tony J. Tanke, *To Move or Not to Move: Psychological and Legal Considerations in the Relocation of Children Following Divorce,* 30 Fam. L.Q. 305, 311, 318 (1996) (social science research on custody does not support the presumption that frequent and continuing access to both parents is in the child's best interests; therefore a parent with primary physical custody generally should be able to relocate with the child).

Not surprisingly other social study research suggests that children are better off if they have frequent contact and good relationships with both parents, Marion Gindes, Ph.D., *The Psychological Effects of Relocation for Children of Divorce,* 10 J. Am. Acad. Matrim. Law. 119, 132 (1998), or that any move, even a relatively short one, is a stressful event for a child, and can have a negative impact on the child's well-being. *See, e.g.,* Joan B. Kelley & Michael E. Lamb, *Using Child Development Research to Make Appropriate Custody and Access Decisions for Young Children,* 38 Fam. & Conciliation Cts. Rev. 297, 309

(2000) (regardless of who is the primary caretaker, a child benefits from extensive contact with both parents); David Wood et al., *Impact of Family Relocation on Children's Growth, Development, School Function, and Behavior,* 270 JAMA 1334, 1337 (1993) ("[a] family move disrupts the routines, relationships, and attachments that define the child's world").

This debate among social scientists undoubtedly adds to, or at least explains, the disparate approaches among the various jurisdictions to relocation issues. The appropriate crucible for transforming social theories into jurisprudential policy is the Legislature. In the absence of clearly articulated statutory standards, however, it is the function and prerogative of this Court to provide a measure of guidance to our courts, practitioners and litigants. In this troubling and very difficult area of relocation, the ever-present beacon, as in all matters relating to the custody of children, is the best interests of the child. The determination of what is in the best interests of a particular child is appropriately placed in the sound discretion of the trial justice.

We also recognize, however, that a child's "best interests" can be an imprecise and elusive standard, particularly when applied in relocation cases. The child of divorced or separated parents necessarily divides his or her time between two households. Each parent will assume various parental responsibilities. To the extent that it can be said that one parent exercises significantly more of such responsibilities than the other, the general stability, well-being and happiness of that parent's

---

both the custodial party seeking the relocation and the child, including but not limited to, financial or emotional benefit or educational opportunity;

(7) the reasons of each person for seeking or opposing the relocation; and

(8) any other factor affecting the best interests of the child." 15 J. Am. Acad. Matrim. Law. § 405 (1998).

family unit will have a direct bearing on the child's well-being. Conversely, the child's opportunity to maintain a meaningful relationship with the other parent, no matter how diminished that parent's role may be, will undoubtedly have some impact on the child's best interests. As the Connecticut Supreme Court said in *Ireland*, 717 A.2d at 680:

> "We recognize the difficult issues that relocation cases present. The interests of the custodial parent who wishes to begin a new life in a new location are in conflict with those of the noncustodial parent who may have a strong desire to maintain regular contact with the child. At the heart of the dispute is the child, whose best interests must always be the court's paramount concern. Those interests do not necessarily coincide, however, with those of one or both parents."

It is the trial justice who is in the best position to determine what factors may be relevant on a case-by-case basis, and his or her discretion in this regard should not be unduly constrained. Certain factors, however, can be identified which are of significance whenever a parent seeks to move with his or her children. We hold, therefore, that parties either seeking or opposing the relocation of their minor children should present relevant evidence concerning the following factors so that the court may make appropriate findings:

(1) The nature, quality, extent of involvement, and duration of the child's relationship with the parent proposing to relocate and with the non-relocating parent. *See In re Marriage of Burgess*, 51 Cal. Rptr.2d 444, 913 P.2d at 483; *Tropea*, 642 N.Y.S.2d 575, 665 N.E.2d at 151; Model Act, 15 J. Am. Acad. Matrim. Law. § 405(1) (1998).

Any relocation analysis should begin with an assessment of the relationship between each parent and the child. Although certainly a relevant consideration, a parent's legal status as custodial parent is not necessarily controlling. A parent, who previously has been awarded sole custody, has been entrusted with the authority to make decisions regarding the child's health, education, and welfare. In actual practice, however, that parent may not be the child's primary caretaker. So, too, in the case of joint custody, it does not necessarily follow that both parents are, in fact, sharing the custodial responsibilities on a relatively equal basis. The A.L.I. Principles speak in terms of "a parent who has been exercising the clear majority of custodial responsibility." A.L.I. ch. 2, § 2.17(4)(a). We reject any mechanical or formulaic approach to determining which parent may be acting as a primary caretaker or what may constitute a clear majority of custodial responsibility, but leave that to the sound discretion of the trial justice. It entails more than a simple measurement of the time that the child spends with each parent, and requires an examination of the quality of the relationship that the child enjoys with each parent. The A.L.I. Principles emphasize the maintenance of continuity in caretaking for the child, and that "when the child has had one clearly primary caretaker, the best interests of the child are more closely tied to the interests and quality of life of that caretaker than to the other parent." A.L.I. ch. 2, § 2.17, cmt. *a.* at 357. If one parent, in fact, exercises a significant majority of the parental duties and responsibilities, the child's best interests undoubtedly will be closely intertwined with the well-being of that parent. "[T]he paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker—weigh heavily in

favor of maintaining ongoing custody arrangements." *In re Marriage of Burgess,* 51 Cal.Rptr.2d 444, 913 P.2d at 478–79. On the other hand, the attachment between the child and the non-relocating parent also will be an important consideration. *Tropea,* 642 N.Y.S.2d 575, 665 N.E.2d at 149.

■ (2) The reasonable likelihood that the relocation will enhance the general quality of life for both the child and the parent seeking the relocation, including, but not limited to, economic and emotional benefits, and educational opportunities. *Yannas v. Frondistou–Yannas,* 395 Mass. 704, 481 N.E.2d 1153, 1158 (1985) ("An evaluation of the best interests of the child requires attention to whether the quality of the child's life may be improved by the change * * * and the extent to which moving or not moving will affect the emotional, physical, or developmental needs of the child."); *see also Baures,* 770 A.2d at 229 (Court should consider whether the child "will receive educational, health and leisure opportunities at least equal to what is available" in present location.); Model Act, 15 J. Am. Acad. Matrim. Law. § 405(6).

■ (3) The probable impact that the relocation will have on the child's physical, educational, and emotional development. Any special needs of the child should also be taken into account in considering this factor. Model Act, 15 J. Am. Acad. Matrim. Law. § 405(2).

■ (4) The feasibility of preserving the relationship between the non-relocating parent and child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties. *See Ireland,* 717 A.2d at 685; *Tropea,* 642 N.Y.S.2d 575, 665 N.E.2d at 151; Model Act, 15 J. Am. Acad. Matrim. Law. § 405(3).

Certainly, the history and past actions of the relocating parent either to foster the relationship between the child and the other parent, or to frustrate the relationship, would be an important consideration. So, too, would be the failure of the non-relocating parent to avail himself or herself of available opportunities for visitation.

■ (5) The existence of extended family or other support systems available to the child in both locations. *See, e.g., Hollandsworth,* 109 S.W.3d at 664 (the effect of the move on the extended family relationship in the location in which the children and parent will relocate, as well as in the location they presently reside); *Baures,* 770 A.2d at 230 (considers the effect of the move on extended family relationships in both locations).

■ (6) Each parent's reasons for seeking or opposing the relocation.

■ A parent's desire to relocate with his or her children ought not be predicated upon a whim. On the other hand, as we previously have noted, a relocating parent need not establish a compelling reason for the move. The motivation for the relocation, however, will be a significant consideration. Clearly, a vindictive desire to interfere in the other parent's relationship with the child would weigh heavily against the parent seeking to relocate. A.L.I. ch. 2, § 2.17(4)(a). The A.L.I. Principles identify the following non-exclusive list of purposes for a relocation as valid:

"(1) to be close to significant family or other sources of support, (2) to address significant health problems, (3) to protect the safety of the child or another member of the child's household from a significant risk of harm, (4) to pursue a significant employment or educational opportunity, (5) to be with one's spouse or domestic partner who lives in, or is pursuing a significant employment or

educational opportunity in, the new location, (6) to significantly improve the family's quality of life. The relocating parent should have the burden of proving the validity of any other purpose." Section 2.17(4)(a)(ii).

The A.L.I. Principles further provide that a move for a valid purpose is reasonable unless "its purpose is shown to be substantially achievable without moving, or by moving to a location that is substantially less disruptive of the other parent's relationship to the child." Section 2.17(4)(a)(iii).

■ The motives of the parent opposing the move also should be considered. A parent may be objecting to the child's relocation to secure a financial advantage or to exercise a measure of control over an ex-spouse, rather than out of a sincere desire to foster a relationship with the child.

■ (7) In cases of international relocation, the question of whether the country to which the child is to be relocated is a signatory to the Hague Convention on the Civil Aspects of International Child Abduction will be an important consideration.

■ (8) To the extent that they may be relevant to a relocation inquiry, the *Pettinato* factors also will be significant.[9] We reemphasize that our recitation of factors to be considered is not intended to be exhaustive. Nor is any one factor disposi-

tive. Each case will present its own unique circumstances that a trial justice must balance and weigh as he or she deems appropriate.

## IV

With these principles in mind, we turn to the case now before us.

Here, the decision pending entry of final judgment and property settlement agreement granted both parties joint custody, as well as shared physical possession and placement of the two minor children in accordance with a specified schedule. That schedule, however, provided for primary placement only for a limited period, and required the Family Court to resolve the issue if "the parties cannot agree as to the primary placement of the children for academic year 2001–2002." Further, and significantly, the interlocutory order and the parties' agreement set forth the circumstances upon which the order was made:

"(i) The Defendant wishes to reside in Tahiti with the minor children;

(ii) The minor children wish to reside with the Defendant in Tahiti;

(iii) The Plaintiff resides in the State of Rhode Island;

(iv) The Defendant may or may not decide to reside in the State of Rhode Island in the future;

---

**9.** The factors set forth in *Pettinato v. Pettinato*, 582 A.2d 909, 913–14 (R.I.1990) are:

"1. The wishes of the child's parent or parents regarding the child's custody.
"2. The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.
"3. The interaction and interrelationship of the child with the child's parent or parents, the child's siblings, and any other person who may significantly affect the child's best interest.

"4. The child's adjustment to the child's home, school, and community.
"5. The mental and physical health of all individuals involved.
"6. The stability of the child's home environment.
"7. The moral fitness of the child's parents.
"8. The willingness and ability of each parent to facilitate a close and continuous parent-child relationship between the child and the other parent." (Footnotes omitted.)

(v) Rhode Island is the Home State under the Uniform Child Custody Jurisdiction Act; and,

(vi) This order is in the best interests of the children."

The matter came before the Family Court for a hearing on the issue of placement, as well as on Melanie's request to relocate with the children to Huahine. After considering the *Pettinato* factors, and awarding joint custody to both parents, the court specifically found that Melanie "would best serve the emotional and physical needs of the children." Further, it declared that the "children will need to continue their development in accordance with the manner that was established prior to the divorce," which can only be effectuated by placing them in the possession of their mother. The court then denied her request to relocate the children because Melanie failed to demonstrate a compelling reason to reside in Huahine.

▉▉▉ Robert asserts that the court erred by awarding physical placement to Melanie without making a concomitant finding that there had been a substantial change of circumstances to warrant a modification of the previous order of joint physical placement. We conclude, however, that the trial justice was correct to treat the issue as an initial determination of placement, rather than as a modification of an existing order.[10] The agreement between the parties, as incorporated in the decision pending entry of final judgment, provided for "shared physical possession and placement" of the children only for a specific period, and clearly contemplated that the issue of permanent placement might be determined by the Family Court after the children returned from Tahiti. Unlike the situation in *D'Onofrio*, the issue

of primary placement had not been resolved with any degree of finality or permanence. In essence, when the parties executed the property settlement agreement on April 4, 2001, they agreed to give themselves an additional four and a half months to attempt to resolve the matter on their own, either with or without the assistance of counseling or mediation. The parties having failed to reach an agreement, however, the Family Court had the authority to fashion an order of placement consistent with the children's best interests.

We treat the Family Court proceedings, therefore, as an initial determination of placement, or physical custody, rather than as a modification of an existing order. This is not a distinction without significance. The vast majority of case law to which we previously have alluded, involves post-final judgment relocations. Thus, within the context of this case, we need not delve into such considerations as the allocation of the burden of proof as an appropriate means of advancing the best interests of a child when a parent seeks to move to another geographical location. In post-judgment proceedings, the court already has determined as to what custodial arrangements best serve the child. The child has an interest not only in preserving the stability of those custodial relationships, but also in avoiding the potential trauma of relitigating these issues. Here, however, the issue of primary placement specifically was left open.

▉▉▉ In initial custody and placement determinations, the focus is squarely on the best interests of the child, and the parents come before the court on an equal footing, with both "shar[ing] equally the burden of demonstrating with which parent the child's best interests will be

---

**10.** Because the trial justice awarded joint custody to both parties, we need not consider

whether he properly determined the custody issue *de novo*.

served." *Jaramillo*, 823 P.2d at 308 (quoting *Hartman v. Hartman*, 328 Pa.Super. 154, 476 A.2d 938, 940 (1984)). Each parent should be able to submit as much relevant information as he or she chooses, and the trial court should be free to adopt the arrangement that it determines best promotes the child's interests. *Id.* at 309.

■ For her part, Melanie argues that the Family Court erred by improperly applying a compelling-reason test, and by failing to consider the children's best interests. We agree and accordingly vacate the decision.

In a very real sense, this case cannot properly be characterized as a true relocation case. At the time of the hearing, Melanie, for better or worse, was living in Huahine. The court was not presented with the option of a viable physical custody arrangement in which the children could maintain frequent and regular contact with both parents. That ship already had sailed from port. Melanie had made it abundantly clear to Robert, Dr. Hayden, and the court that she desired and intended to reside in Huahine. Indeed, this was acknowledged in the parties' own agreement. Moreover, it would have been clearly impermissible for the court to deny her request to relocate as a means of attempting to coerce her to remain in Rhode Island.

The question confronting the Family Court, rather, was whether it was in the children's best interests to reside primarily with their mother a half a world away from their father, or with their father a half a world away from their mother. It is a question to which there can be no satisfactory answer. The court did evaluate the children's best interests in a general sense and determined that "mother would best serve the emotional and physical needs of the children" and that their continued development "can only be effectuated by placing the children in the possession of their mother." It failed to evaluate their best interests, however, in light of the then-existing circumstances, including mother's relocation. *See Moeller–Prokosch v. Prokosch*, 27 P.3d 314, 317 (Alaska 2001).

This was not a situation in which a parent wished to relocate to an area about which he or she had little information. For all practical purposes, Huahine was Melanie's primary home by the time of the hearing. Moreover, the children had lived in Huahine during the 1999–2000 school year, and were able to describe their experiences there to the trial justice. Clearly, evidence was adduced respecting educational opportunities, health care, and quality of life in Huahine from which the court could make findings of fact relative to the children's best interests.

We recognize, however, that had the Family Court properly considered the children's best interests, the outcome may well have been the same. The defendant chides the trial justice for stating that "the court has concerns regarding the children residing in Huahine, yet not articulating these concerns." We are persuaded, however, that his concerns were self-evident and well-founded. The distance involved virtually precludes any visitation except during school vacation periods, and the time difference makes even electronic communication problematic. There can be little question that the children's relocation to Huahine would likely have a profound impact on Robert's relationship with them.

On the other hand, Melanie's desire to live in Huahine was hardly caprice. She testified that she had made it clear throughout the marriage that she wanted to live there, and indeed Robert said it was one of the reasons for the dissolution of their marriage. The children had lived

with her and attended school in Huahine during the year preceding the parties' divorce. More importantly, the parties acknowledged in their agreement, which was incorporated into the interlocutory order, that not only did she wish to reside in Tahiti, but also the children wished to reside there with her.

### Conclusion

Implicit in an award of joint legal custody, either by agreement or by judicial determination, is an acknowledgment of the value of both parents in the physical, emotional, educational, and spiritual development of their children. It also presumes that both parents will act and make decisions in the best interests of their children's welfare. Hopefully, joint custodial parents can resolve major differences on their own. If unable to do so, however, they are encouraged to use mediation or other nonadversarial means of dispute resolution. Here, the Family Court was presented with an intractable problem to which there was no satisfactory answer. We vacate not because we are persuaded that the court's decision was inimical to the children's welfare, but because by applying an improper standard, it failed to address their best interests. We remand, therefore, for a new hearing on the issue of placement with directions to evaluate the present best interests of the children in light of current circumstances.

Justice FLAHERTY did not participate.