June 26, 2020

**Supreme Court**

No. 2018-187-Appeal.
(16-345-1)

In re Indiana M.               :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2018-187-Appeal.
(16-345-1)
(Concurrence and Dissent begins on page 13)

In re Indiana M.                    :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.**  Svetoslava Petrova (Petrova or mother) appeals from a Family Court order denying, without prejudice, Petrova's motion to intervene, as well as her motion to vacate or, in the alternative, to revoke a guardianship regarding her daughter, Indiana. For the reasons set forth herein, we affirm the order of the Family Court.

**I**

**Facts and Travel**

For reasons that will become apparent in this opinion, there has never been an evidentiary hearing in this matter.  Thus, the "facts" set forth herein are largely based upon the representations of counsel; an affidavit of Erwin Siregar, an attorney in Indonesia retained by the family of the child's father; and the pleadings filed by the Department of Children, Youth, and Families in conjunction with a related neglect petition.  We recount the history of this case simply to provide some context for the issues presented on appeal, bearing in mind that none of the facts have been established through court findings.

Fortunately, the most significant matters are essentially uncontested. Indiana was born to Petrova on the island of Bali in Indonesia on October 11, 2012.  Petrova is a citizen of Bulgaria who now lives in that country.  The child's biological father is Eric Millan (Millan or father).  He

- 1 -

is a United States citizen, and he left Indonesia "shortly after the birth or prior to the birth[,]" according to mother's attorney. The child lived with mother for the first three years of the child's life, until October 2015, when mother appears to have suffered a severe mental-health episode, causing her to leave her daughter with a daycare provider for approximately eight days.[1] During this period, father was contacted and traveled to Indonesia with his mother and brother to take physical custody of Indiana.

Upon their return to the United States, father, who was either unwilling or unable to care for the child, voluntarily placed her with Justin Millan (Justin) and Jora Ehrlich (Jora)[2] in Rhode Island. In February 2016, they contacted DCYF. DCYF filed a petition on March 17, 2016, alleging that Indiana had been neglected by both parents. The Family Court granted temporary custody to DCYF, and DCYF placed the child with father. It is apparent, however, that the child continued to reside with Justin and Jora. In June 2016, DCYF reported to the court that it was actively working with father toward reunification and that, if mother was "able to come to the USA, DCYF [would] case plan with her as well." The neglect petition was then continued until September 6, 2016, for trial or disposition.

On that date, a guardianship petition on behalf of Justin and Jora was filed under the provisions of G.L. 1956 § 40-11-12. The petition was signed by father, signifying his consent to the guardianship. Father also appeared in court with counsel to satisfy the hearing justice that he was freely, willfully, and knowingly consenting to the guardianship. The petition was continued until October 14, 2016, at which time Justin and Jora testified that the child had been living with

---

[1] In Petrova's submissions to this Court, she has acknowledged experiencing such an episode. In an email she sent to the United States Embassy in Bulgaria on August 22, 2016, she wrote: "I have no memories of my actions but people are telling me that I have done those things."

[2] Justin and Jora are Indiana's paternal uncle and aunt. We identify them by their first names solely for the sake of clarity. No disrespect is intended.

them since October 2015.  They further testified that they understood their responsibilities as guardians and that one or both of the child's parents could petition the court to terminate the guardianship.  Indiana's guardian *ad litem* recommended that the guardianship be granted as being in the best interest of the child.  Finally, the hearing justice reviewed the home study prepared by DCYF, specifically noting that Justin and Jora "support[ed] ongoing connections with the birth and extended family."  The hearing justice granted the guardianship petition and closed the neglect petition.  An order appointing Justin and Jora as guardians of Indiana entered on November 9, 2016.

Several months later, on September 11, 2017, mother filed a "motion to vacate, otherwise grant relief, or in the alternative, to revoke guardianship[.]"  She argued that the Family Court proceedings had disregarded the Family Court Rules of Domestic Relations Procedure and violated her Fourteenth Amendment due process rights.  Mother asserted that the Family Court lacked the authority to grant the guardianship because she had not been a party to the proceedings and she had not received notice thereof.  Mother also contended that the court had violated § 40-11-12 by failing to obtain her written consent to the guardianship.  On November 4, 2017, the court entertained arguments regarding mother's motion.  Mother was not present, but was represented by counsel.

At the outset of the November 4, 2017 hearing, the hearing justice stated, "I do have the original affidavit filed by DCYF seeking removal of the child in * * * March of 2016.  It indicates [that on] February 15 of 2016, the DCYF hotline received a call that the mother of Indiana * * * had abandoned her daughter at a day care for eight days in Bulgaria [*sic*]."  The hearing justice

continued to describe the statements within the affidavit, including that father went to "Bulgaria"[3] on October 15, 2015, to retrieve Indiana, that mother was detained at the airport for "exhibiting bizarre and dangerous behavior[,]" and that police found human waste in mother's home. The hearing justice also stated that the affidavit asserted that father had substance-abuse and mental-health issues and that, at one point, he "wanted to bring the child back to Bulgaria to live with mother[.]"

The hearing justice inquired why mother had waited two years to come forward, to which mother's counsel responded that he was pressing a motion to intervene.[4] Father's counsel stated that "[i]t's father's belief that wholeheartedly this child is where she belongs." The hearing justice stated that the motion to vacate the guardianship was the only matter before her, and that its determination would be based on the best interests of the child and whether there was a significant change in circumstances such that mother was "fit and able to take care of the child[,]" which was mother's burden to prove. Petrova argued that, because she had not been a party to the proceedings, the guardianship was "void and illegal." The hearing justice continued the hearing until January 22, 2018, so that Julie Emmer, the DCYF social caseworker previously involved with the child, could be present in court.

On that date, the hearing on Petrova's motion to vacate the guardianship resumed. Through counsel, mother represented that she had "tried on at least five occasions * * * going back to 2015"

---

[3] While the DCYF documents referred to Bulgaria as the place from which father retrieved Indiana, several other documents in the record are clear that mother's mental-health episode occurred in Indonesia and that father actually went to Indonesia to get Indiana.

[4] Indiana has not been in mother's care since October 2015, when Indiana came to the United States. The guardianship petition was granted on October 14, 2016. Mother's motion to vacate was filed on September 11, 2017—nearly two years after Indiana came to the United States and just shy of one year after the guardianship petition had been granted, which officially placed Indiana with Justin and Jora.

to come to the United States, but she had been unable to obtain a temporary visa. She argued that the guardianship was void because her due process rights had been violated, she had not been properly served, and her consent to the guardianship should have been required.

When asked by the hearing justice about Emmer's communication with mother, Emmer stated that she communicated with mother "quite regularly via e-mail and phone[,]" and that mother "was very aware of the guardianship. * * * I read it to her on the phone. I mean, she was very aware of the guardianship. She knew the date."[5] Emmer also referenced an article in a Bali newspaper which described mother "leaving Indiana at the day care for eight days" as well as the fact that, "when the police went into the home, there was feces everywhere. The home was deplorable. There was broken glass and artwork." She added that mother had admitted to these things, explaining that mother had been in a "physically abusive relationship," "was not emotionally well," and had "essentially blacked out for a period of time[.]" Emmer stated that she had "actively case planned" with mother.

The hearing justice denied mother's motion to vacate the guardianship, noting that the guardianship petition had been granted based upon father's representation that he was the only parent who had physical placement of the child in the United States. She further concluded that leaving the guardianship in place was in the best interest of the child. An order entered on March 28, 2018, denying mother's motion and directing that the guardianship "remain in full force and effect until a significant change in circumstances is demonstrated." Mother filed a notice of appeal on May 18, 2018.[6]

---

[5] Notably, Emmer was not under oath at the time she said this in open court.

[6] We recognize that, at first glance, mother's appeal was not timely filed. The record of this case includes a "stipulation/order," signed and dated by the hearing justice and entered on May 3, 2018, stating that "[t]he order entered on March 28, 2018 by the [c]ourt is vacated by agreement, to be re-entered effective 5/3/18." We are not overlooking the fact that "the courts of this state lack

## II

## Standard of Review

This Court employs an abuse-of-discretion standard when reviewing the rulings on motions before the Family Court because "it is the trial justice who is in the best position to determine what factors may be relevant on a case-by-case basis, and his or her discretion in this regard should not be unduly constrained." *McDonough v. McDonough*, 962 A.2d 47, 52 (R.I. 2009) (brackets omitted) (quoting *Dupré v. Dupré*, 857 A.2d 242, 257 (R.I. 2004)). As always, we review questions of law, including those involving statutory interpretation, *de novo*. *In re Toryn C.*, 982 A.2d 592, 594 (R.I. 2009).

## III

## Discussion

On appeal, mother argues that her due process rights were violated because she was never served with process for either the neglect or guardianship petitions. Thus, she asserts, she was never made a party to the Family Court proceedings. Citing to *Nisenzon v. Sadowski*, 689 A.2d 1037 (R.I. 1997), for the proposition that "jurisdiction of the court over the person of a defendant is dependent upon proper service having been made[,]" *Nisenzon*, 689 A.2d at 1049 (quoting *Shannon v. Norman Block, Inc.*, 106 R.I. 124, 130, 256 A.2d 214, 218 (1969)), Petrova maintains that the guardianship order is void *ab initio*.

Second, mother argues that the guardianship petition was granted in violation of statutory law in that she never gave written consent to the petition. Section 40-11-12(e) provides: "No

jurisdiction to vacate and then to re-enter a judgment as a means of extending the time allowed under the applicable statutory limitation for the claiming of an appeal." *In re Kyla C.*, 79 A.3d 846, 847 (R.I. 2013) (mem.). Rather, we accept counsel's representation, made during oral argument, that the original March 28, 2018 order had been inadvertently entered on that date notwithstanding mother's objection, pending at that time, to the wording of the proposed order.

petition for guardianship shall be granted unless it contains the written consent of the parent or parents previously having custody of the child and of [DCYF]." The hearing justice found "based on [father's] testimony that he was the last custodial parent, [and] [t]he mother [was] not in the United States [and had] not been the caretaker of the child for some time"; she subsequently granted the petition. Mother asserts that the hearing justice erred by construing the statute to require the consent of only the parent last having custody. In the alternative, mother argues that she is a parent "previously having custody of the child"; therefore, the guardianship should not have been granted without her consent.

We begin our analysis with our explicit recognition that this case presents a unique set of complicated circumstances that do not fit squarely within the existing statutory framework. The child originally came to the United States because of mother's admitted inability or incapacity, temporary or otherwise, to appropriately care for the child in Indonesia. Since then, mother, a non-citizen, has been unable to obtain a visa that would permit her to enter the United States. Consequently, she has been unable to have any physical contact with Indiana. Father, for his part, does not appear to ever have been the primary caretaker of Indiana. Instead, the child has resided with Justin and Jora continuously since October 2015, when she arrived in the United States from Indonesia. By all accounts, the child is thriving in their care and remains in regular contact with both of her biological parents.

Notwithstanding the logistical impediments to the mother-daughter relationship at the center of this controversy, the legal principles at hand are immutable. "Natural parents have a fundamental liberty interest in the care, custody, and management of their child[.]" *In re Antonio G.*, 657 A.2d 1052, 1057 (R.I. 1995) (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)). This interest "does not evaporate simply because they have not been model parents or have lost

temporary custody of their child to the State." *Santosky*, 455 U.S. at 753; *see Troxel v. Granville*, 530 U.S. 57, 65 (2000).

It is important to bear in mind that mother's parental rights have not been terminated, nor are we aware of any proceedings having been initiated to that end. Indeed, there have been no judicial findings of unfitness, abandonment, or any of the statutory circumstances that would warrant the termination of her parental rights. On the other hand, based upon the information available to DCYF (and ultimately to the Family Court) and the fact that mother has been physically absent from the United States, it was eminently reasonable for the Family Court to place the child in the temporary custody of DCYF. Further, in light of father's reluctance to assume the responsibilities of fatherhood, we have little doubt that a guardianship provides the child with a more stable situation than would continued temporary custody with DCYF.

As mentioned *supra*, Petrova argues that, because she was never served with process in the guardianship petition, she was denied her right to due process. Thus, she asserts, the Family Court lacked jurisdiction to entertain the petition, and the guardianship order was consequently void *ab initio*.

As this Court has previously pronounced, "[d]ue process requires 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Izzo v. Victor Realty*, 132 A.3d 680, 688 (R.I. 2016) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). We note that the statute at issue, § 40-11-12, specifically provides for notice only with respect to a hearing on a motion to *revoke* guardianship, § 40-11-12(g); it is silent concerning notice of a petition seeking the *grant* of a guardianship. Service of process in juvenile proceedings is governed by Rule 27(a) of the Family Court Rules for Juvenile Proceedings, which provides that

"[w]hen required, written motions * * * shall be served upon each of the parties." Simply put, service of process of a guardianship petition is not statutorily-mandated.

There is no indication from the sparse record before us that Petrova was served with process or that she was provided with formal written notice of the guardianship proceedings. Although she was not under oath, Julie Emmer, the DCYF social caseworker, represented, nonetheless, that she was in communication with Petrova and that Petrova was well aware of the guardianship proceeding, even though Petrova did not agree with it. The hearing justice credited Emmer's statements and concluded that, despite the lack of formal service of process, the petition had been properly granted. We agree.

Our conclusion is significantly informed by the nature of guardianship proceedings. A guardianship does not create a permanent relationship; rather, it is by its very nature a temporary status. In this case, the guardianship has been necessitated by the exigencies of Indiana's circumstances. The guardianship has not, however, terminated Petrova's parental rights. Indeed, guardianship is not an irretrievable severing of the bond between parent and child.

Under § 40-11-12(f), "[t]he court may revoke a guardianship awarded pursuant to this section if the court finds, after a hearing on a motion for revocation, that continuation of said guardianship is not in the best interests of the child." This factor was made very pointedly to Justin and Jora at the October 14, 2016 hearing on their guardianship petition:

> "[Counsel for Justin and Jora]: You both understand that in order for this guardianship to be terminated, one of two things needs to happen * * * either Indiana turns 18 * * * or one of her parents would have to petition this [c]ourt to terminate that guardianship; is that right?
>
> "[Jora]: Yes.
>
> "[Counsel for Justin and Jora]: You understand that, right?

- 9 -

"[Jora]: Yes.

"[Counsel for Justin and Jora]: You understand that in order for this [c]ourt to terminate the guardianship that it has to find that it's in Indiana's best interests for the guardianship to be terminated; is that right?

"[Jora]: Yes."

Petrova also argues that the guardianship petition could not be granted without her consent. Under § 40-11-12(e), "[n]o petition for guardianship shall be granted unless it contains the written consent of the parent or parents previously having custody of the child * * *." Here, the child had been in the legal custody of father for approximately eleven months before he consented to the guardianship petition, although Indiana was residing with Justin and Jora for most of that time. During this period, mother had never been legally divested of custody; as a practical matter, however, she was not in a position to meaningfully exercise custody as she was unable to enter the United States. It is clear to us that the General Assembly, by enacting § 40-11-12, intended to provide a measure of flexibility to DCYF when faced with emergent circumstances, such as those presented by the facts of this case. Under the circumstances of this case, therefore, we are of the opinion that the hearing justice properly granted the guardianship petition.

In light of the unique circumstances of this case, we believe it appropriate to set forth a framework for the Family Court's consideration of a motion for revocation of the guardianship in the event Petrova elects to file such a motion. Clearly the allegations concerning her conduct in Indonesia that precipitated the chain of events culminating in the guardianship petition raise serious and legitimate concerns with respect to her ability to parent. As previously stated, however, Petrova's actions have never been the subject of judicial fact finding. She has acknowledged suffering from a mental-health episode. We deem it appropriate, therefore, that Petrova be required to initially establish by a preponderance of the evidence that she is a fit and proper parent,

- 10 -

such that she is capable of reassuming custody of her daughter. By doing so, she will necessarily satisfy the court that she has addressed the concerns that caused Indiana to be removed from her care.

If Petrova is able to cross this threshold, the light of judicial inquiry must then shine squarely on the best interests of the child. *See McDonough*, 962 A.2d at 52 (recognizing that the "paramount consideration" in deciding where to place a child is "the best interests of the child") (quoting *Dupré*, 857 A.2d at 252). We recognize, however, that Petrova has never been adjudicated to be an unfit parent, nor did she consent to the guardianship. Indeed, she has never voluntarily agreed to limit her parental rights to the child. The United States Supreme Court has said: "The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel*, 530 U.S. at 65. It is an interest rooted not only in our Constitution—"it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children[,]" *id.* at 66—but also in natural law: "the liberty interest in family privacy has its source, and its contours are ordinarily to be sought, not in state law, but in intrinsic human rights, as they have been understood in 'this Nation's history and tradition.'" *Smith v. Organization of Foster Families For Equality and Reform*, 431 U.S. 816, 845 (1977) (quoting *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977)).

Such rights, however, are not absolute. As the United States Supreme Court also instructs, "the rights of the parents are a counterpart of the responsibilities they have assumed." *Lehr v. Robertson*, 463 U.S. 248, 257 (1983). Here, unlike Millan who voluntarily relinquished his rights to make day-to-day decisions on behalf of the child by consenting to the guardianship petition,

Petrova did not so consent. On the other hand, it was she who caused the child to come into the care and placement of Millan through either her actions during a mental-health episode, of which she has no memory (according to Petrova), or her conscious actions of neglect (according to Millan). In either event, it would appear that Petrova bears some responsibility for Indiana's current situation. Again, we emphasize, there has been no judicial fact finding.

In light of these circumstances, we hold that, should Petrova be found to be a fit and proper parent, the burden must then shift to the proponents of the guardianship to demonstrate by clear and convincing evidence that continued guardianship is in the best interests of the child. The ultimate purpose of this approach is to allow the hearing justice to consider the best interests of the child, while giving due regard to Petrova's rights as a fit and proper parent. We also recognize that father and DCYF will be parties whose interests will have to be considered by the court.

This will not be an easy task for the Family Court; few cases involving the custody of children are. The justices of that court, however, are well used to weighing a variety of disparate factors in deciding such cases. We also emphasize that, by setting forth a framework for resolving this case, we by no means intend to limit the factors that the hearing justice may consider appropriate in his or her discretion.

Nor do we suggest that this would be the proper method of resolving all motions seeking the revocation of a guardianship. This is an extraordinary case predicated upon exceptional circumstances: a mother who, almost five years ago, lost custody of her daughter, notwithstanding the lack of judicial adjudications, and who is now unable to enter the United States due to her inability to obtain a visa; a father who has little inclination to assume parental responsibilities and who has voluntarily relinquished his custodial rights; and two guardians who have provided a

nurturing home for the child and who appear to have admirably fulfilled the parental role, temporary as it may possibly be.

In summary, we affirm the order of the Family Court denying Petrova's motion to vacate the guardianship on the grounds that she was denied her right to due process and that the guardianship petition was granted without her consent. We do so, however, without prejudice to her filing a motion to revoke the guardianship under § 40-11-12(g).

## IV

## Conclusion

For the reasons set forth herein, we affirm the order of the Family Court and return the record to that tribunal.


**Justice Robinson, concurring in part and dissenting in part.**  I am pleased to be able to concur in the opinion of my colleagues in the majority with respect to the issue of Svetoslava Petrova's written consent to the guardianship of her daughter.  However, I must record my respectful but vigorous dissent to the majority's conclusion with respect to the requirement of notice to Ms. Petrova prior to the commencement of guardianship proceedings.

I must begin by expressing my wholehearted agreement with the majority's emphasis on the unique nature of the facts presented in this case; it is certainly one of a kind.  That being said, in my opinion, the due process issue presented in this unique case may have a bearing on future cases in other contexts, and I feel compelled to set forth my view.

In my opinion, due process required that a reasonable attempt at providing notice to Ms. Petrova be made before the initial guardianship proceeding commenced in this case.  *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental

- 13 -

requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."); *see also Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 171-72 (1951) (Frankfurter, J., concurring) ("No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it. Nor has a better way been found for generating the feeling, so important to a popular government, that justice has been done."). Accordingly, as there has been no hearing conducted nor any subsequent fact-finding on the issue of notice, in my judgment, this case should be remanded for a hearing to determine whether or not Ms. Petrova had actual notice of the guardianship proceeding.

As the majority recognizes, "[n]atural parents have a fundamental liberty interest in the care, custody, and management of their child * * *." *In re Antonio G.*, 657 A.2d 1052, 1057 (R.I. 1995) (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)). A parent's liberty interest remains even when he or she has not been a "model parent[ ]" or has temporarily lost custody of his or her child. *Santosky*, 455 U.S. at 753. The imposition of a guardianship over a child necessarily deprives a natural parent, even if it is only temporarily, of some of his or her parental rights—*e.g.*, the companionship of his or her child and the right to have a voice in that child's upbringing. For that reason I believe that, regardless of whether it is specifically required by statute, the fundamental principles of due process would require some meaningful type of notice before a guardianship is imposed in view of the serious nature of a court-decreed guardianship.[1] *See, e.g.*, *Bioni v. Haselton*, 134 A. 606, 608 (Vt. 1926) ("We think that the petitioners were entitled to

---

[1]     I acknowledge that there will be times when notice in a particular case will turn out to be ineffective, as well might have been the case here; but there nonetheless must have been a meaningful attempt at giving adequate notice.

notice and opportunity to present evidence of their circumstances, characters, and habits before an order should be made to deprive them of their natural right of guardianship over their minor child * * *."). Indeed, "[w]hen addressing fundamental parental rights of constitutional magnitude, courts must accommodate to the keenest spirit of procedural due process." *In re Guardianship of MEO*, 138 P.3d 1145, 1156 (Wyo. 2006) (internal quotation marks omitted).

The only evidence which has been presented as to whether or not Ms. Petrova received notice in advance of the guardianship proceeding is the statement of Julie Emmer, a Department of Children, Youth, and Families (DCYF) social caseworker involved with Indiana M., to the effect that Ms. Petrova was aware of the guardianship proceeding. However, that statement was not made under oath. Consequently, in my opinion, the record fails to sufficiently establish that there was constitutionally adequate notice. Accordingly, I would remand the case to the Family Court for a hearing on whether or not Ms. Petrova had actual notice of the guardianship proceeding (which actual notice would be sufficient to satisfy the dictates of due process).

I consider it necessary to specifically contend with one further point made by the majority. It is admittedly true that we are not confronted in the instant case with the termination of parental rights, nor have there been any judicial findings of unfitness or abandonment; and, I also concede that a guardianship is temporary and can be revoked. However, that simply does not alter the fact that a guardianship infringes on the liberty interest of the parent, even if only temporarily, and due process requires notice to both parents before such an infringement of their constitutional rights may take place. *See* Deirdre M. Smith, *Keeping It in the Family: Minor Guardianship as Private Child Protection*, 18 Conn. Pub. Int. L.J. 269, 286 (2019) ("While the appointment of a guardian does not terminate parental rights permanently, the rights of a parent are subject to those of the guardian and essentially suspended."). Additionally, in order for a court to revoke a guardianship,

it must conclude that revoking the guardianship is in the best interests of the child—a revocation is not simply automatic. *See* G.L. 1956 § 40-11-12(f); *see also In re Guardianship of MEO*, 138 P.3d at 1156 (requiring notice to a parent before granting a guardianship over a child and noting "the difficulty of regaining physical custody once lost") (internal quotation marks omitted). What is more, I would note that, in this particular case, in order to revoke the guardianship at issue, this Court is explicitly requiring Ms. Petrova to meet an additional requirement. She must show by a preponderance of the evidence that she is a fit and proper parent and is capable of reassuming custody of her daughter. That is, in my opinion, all the more reason that due process required that she be provided notice before the commencement of the guardianship proceeding in this case. *See In re Guardianship of MEO*, 138 P.3d at 1156 ("When a parent's fundamental liberty interest is at stake, the State must provide parents 'with fundamentally fair procedures.'") (quoting *Santosky*, 455 U.S. at 753-54).

Accordingly, I record my respectful but fervent dissent.

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re Indiana M. |
| **Case Number** | No. 2018-187-Appeal.<br>(16-345-1) |
| **Date Opinion Filed** | June 26, 2020 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer From Lower Court** | Associate Justice Laureen A. D'Ambra |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Michael D. Coleman<br>Department of Children Youth and Families<br><br>Karl D. Beauregard<br>Court Appointed Special Advocate<br><br>Susan M. Fink, Esq.<br>Guardian Ad Litem |
| | For Respondent:<br><br>Lauren E. Jones, Esq.<br>Timothy Sweet, Esq.<br>Sarah C. Sebren, Esq.<br>Christopher E. Heberg, Esq.<br>Robert S. Thurston, Esq. |

SU-CMS-02A (revised June 2016)